**PYRAMID LAKE PAIUTE TRIBE OF INDIANS, Plaintiff,**

v.

**Rogers C. B. MORTON, Secretary of the Interior, Defendant.**

**Civ. A. No. 2506–70.**

United States District Court, District of Columbia.

Nov. 8, 1972.

As Amended Nov. 29, 1972.

Supplemental Opinion Feb. 20, 1973.

Robert S. Pelcyger, Boulder, Colo., Robert D. Stitser, Reno, Nev., Reid Peyton Chambers, Los Angeles, Cal., L. Graeme Bell, III, Washington, D. C., for plaintiff.

Donald W. Redd, Douglas N. King, Department of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GESELL, District Judge.

This is an action by a recognized Indian tribe challenging a regulation issued by the Secretary of the Interior. The matter came before the Court for trial without a jury following an extended period of pretrial activity during which issues were narrowed and efforts to resolve the controversy by negotiation failed. Claiming that the regulation should be set aside as arbitrary, capricious, and an abuse of the Secretary's authority, the Tribe invokes applicable provisions of the Administrative Procedure Act, 5 U.S.C. § 706. A declaration of rights and affirmative injunctive relief is also sought on the ground the Secretary has unlawfully withheld and unreasonably delayed required actions, 5 U.S.C. § 706(1).

The Court's jurisdiction to review the challenged regulation under the Administrative Procedure Act is not contested. The Tribe is an aggrieved party directly affected by the regulation and is proceeding in good faith. The controversy is ripe and immediate. All administrative remedies have been exhausted and the Secretary's action is final.

The regulation was signed by the Secretary on September 14, 1972, appears in the Federal Register, 37 Fed.Reg. 19838, and became effective November 1, 1972. It is designed to implement pre-existing general regulations [1] by establishing the basis on which water will be provided during the succeeding twelve months to the Truckee-Carson Irrigation District, which is located in Churchill County, Nevada, some 50 miles east of Reno. The Tribe contends that the regulation delivers more water to the District than required by applicable court decrees and statutes, and improperly diverts water that otherwise would flow into nearby Pyramid Lake located on the Tribe's reservation.

This Lake has been the Tribe's principal source of livelihood. Members of the Tribe have always lived on its shores and have fished its waters for food. Following directives of the Department of Interior in 1859, which were confirmed by Executive Order signed by President Grant in 1874, the Lake, together with land surrounding the Lake and the immediate valley of the Truckee River which feeds into the Lake, have been reserved for the Tribe and set aside from the public domain. The area has been consistently recognized as the Tribe's aboriginal home. *See* United States v. Sturgeon, 27 F.Cas. 1357, No. 16,413 (D.Nev.1879), aff'd, 27 F. Cas. 1358; United States v. Walker River Irr. Dist., 104 F.2d 334 (9th Cir. 1939).

Recently, the United States, by original petition in the Supreme Court of the United States, filed September, 1972, claims the right to use of sufficient water of the Truckee River for the benefit of the Tribe to fulfill the purposes for which the Indian Reservation was created, "including the maintenanec and preservation of Pyramid Lake and the maintenance of the lower reaches of the

1. 43 C.F.R. § 418 (1972).

Truckee as a natural spawning ground for fish and other purposes beneficial to and satisfying the needs" of the Tribe. United States v. States of Nevada and California, (No. 59 Original, October Term 1972), complaint at 14.

Appended to this Memorandum Opinion is a map which shows the available sources of water supply in relationship to Pyramid Lake and the District. The area involved is a water shortage area characterized by seasonal and yearly variations in available supply. Beneficial irrigation for farming and other uses within the District are accommodated through some 600 miles of main water ditches and drains and the water is ultimately parcelled out through 1,500 delivery points. The water fed into this system comes from the Carson River following storage in Lahontan Reservoir and by diversion of water from the Truckee River at Derby Dam where it passes through the Truckee Canal to be stored in the Lahontan Reservoir for subsequent or simultaneous release. The Secretary entered into a contract with the District in 1926 and this contract is still in effect (Def. Ex. 2).

As the map so clearly shows, any water diverted from the Truckee at Derby Dam for the District is thereby prevented in substantial measure from flowing further north into Pyramid Lake. The Lake is a unique natural resource of almost incomparable beauty. It has no outflow, and as a desert lake depends largely on Truckee River inflow to make up for evaporation and other losses. It is approximately five miles wide and twenty-five miles long and now has a maximum depth of 335 feet. Although the Lake has risen a few feet in recent years, it has dropped more than 70 feet since 1906. A flow of 385,000 acre feet of water per year from the Truckee River into the Lake is required merely to maintain its present level. The de-creased level and inflow have had the effect of making fish native to the Lake endangered protected species, and have unsettled the erosion and salinity balance of the Lake to a point where the continued utility of the Lake as a useful body of water is at hazard.[2]

The regulation under attack is the most recent of a series of regulations issued from year to year since 1967 pursuant to general policies established by the Secretary (see 43 C.F.R. Part 418 (1972) and Def. Ex. 3). The Tribe contends that the Secretary's action is an arbitrary abuse of discretion in that the Secretary has ignored his own guidelines and failed to fulfill his trust responsibilities to the Tribe by illegally and unnecessarily diverting water from Pyramid Lake.

The focus of the inquiry has been to determine whether the 378,000 acre feet of water which the regulation contemplates will be diverted from the Truckee River at Derby Dam may be justified on a rational basis. This determination must be made in the light of three major factors which necessarily control the Secretary's action: namely, the Secretary's contract with the District, certain applicable court decrees, and his trust responsibilities to the Tribe. The Secretary and the Tribe are in substantial agreement that these are the factors to be weighed. The issue, therefore, comes down to whether or not the Secretary's resolution of conflicting demands created by these factors was effectuated arbitrarily rather than in the sound exercise of discretion.

The Court has carefully reviewed the processes by which the Secretary arrived at the disputed regulation. The Secretary had before him various written recommendations from interested agencies and experts, including responsible expert studies presented by the .

---

2. Native fish which naturally spawn in the Truckee can no longer do this and the Lake must be stocked at least until 1974 when construction to permit the fish again to pass into the river for spawning is to be completed.

Tribe.[3] There was a wide variation in these recommendations suggesting diversion of water in varying amounts ranging from 287,000 acre feet to 396,000 acre feet. All purported to be made on the basis of guidelines and policies previously set by the Secretary. After reviewing these written submissions, the Secretary conferred with the Assistant Secretary for Water and Power Resources (with authority over the Bureau of Reclamation) and the Assistant Secretary for Public Land Management (with authority over Indian Affairs) and made what one of these Assistants characterized as a "judgment call." It is affirmatively stated that the Secretary did not accept the recommendation of any particular person or group. The record, therefore, is completely devoid of any explanation or indication of the factors or computations which he took into account in arriving at the diversion figure of 378,000 acre feet. The grounds of his action are therefore not disclosed and there is no way of knowing the basis on which his conclusions rested. Since the record is as complete on this score as it ever can be, the Government has failed to meet its burden of establishing that this decision was anything but arbitrary. *See* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Environmental Defense Fund, Inc. v. Ruckelshaus, 142 U.S.App.D.C. 74, 439 F.2d 584 (1971); DeVito v. Shultz, 300 F. Supp. 381 (D.D.C.1969).

■ Furthermore, while the Secretary's good faith is not in question, his approach to the difficult problem confronting him misconceived the legal requirements that should have governed his action. A "judgment call" was simply not legally permissible. The Secretary's duty was not to determine a basis for allocating water between the District and the Tribe in a manner that hopefully everyone could live with for the year ahead. This suit was pending and the Tribe had asserted well-founded rights. The burden rested on the Secretary to justify any diversion of water from the Tribe with precision. It was not his function to attempt an accommodation.

■ In order to fulfill his fiduciary duty, the Secretary must insure, to the extent of his power, that all water not obligated by court decree or contract with the District goes to Pyramid Lake.[4] The United States, acting through the Secretary of Interior, "has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards." Seminole Nation v. United States, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L. Ed. 1480 (1942); Navajo Tribe of Indians v. United States, 364 F.2d 320, 176 Ct.Cl. 502 (1966).

■ The vast body of case law which recognizes this trustee obligation is amply complemented by the detailed statutory scheme for Indian affairs set forth in Title 25 of the United States Code.[5] Undertakings with the Indians are to be liberally construed to the benefit of the Indians, and the duty of the Secretary to do so is particularly apparent. It is not enough to assert the water and fishing rights of the Tribe by filing a suit in the United States Supreme Court.

The Secretary was obliged to formulate a closely developed regulation that would preserve water for the Tribe. He was further obliged to assert his statutory and contractual authority to the fullest extent possible to accomplish this result. Difficult as this process would

---

3. Commissioner of Indian Affairs, Bureau of Reclamation, Geological Survey, the Fish and Wildlife Bureau, Clyde-Criddle-Woodward, Inc., and Woodward-Clevenger & Associates, Inc., among others.

4. The Secretary's own regulations recognize his trustee obligations. 43 C.F.R. §§ 418.1(b) and 418.3(a) (1972).

5. *E. g.*, 25 U.S.C. §§ 174 and 476; *see* 43 U.S.C. § 614c.

be, and troublesome as the repercussions of his actions might be, the Secretary was required to resolve the conflicting claims in a precise manner that would indicate the weight given each interest before him. Possible difficulties ahead could not simply be blunted by a "judgment call" calculated to placate temporarily conflicting claims to precious water. The Secretary's action is therefore doubly defective and irrational because it fails to demonstrate an adequate recognition of his fiduciary duty to the Tribe. This also is an abuse of discretion and not in accordance with law.

The record before the Court clearly establishes the underlying defects and arbitrary nature of the challenged regulation. The Secretary erred in two significant respects. First, he disregarded interrelated court decrees, and, second, he failed to exercise his authority to prevent unnecessary waste within the District. The effect of this is to deprive the Tribe of water without legal justification.

 Two decrees of the United States District Court for the District of Nevada, known as the Orr Water Ditch and Alpine decrees, govern the amounts and conditions under which water shall be available for beneficial uses in the District. Maximums of roughly 4.5 acre feet and 2.92 acre feet measured at farm headgates are provided in the Orr and Alpine decrees, respectively. Approximately 60–75 percent of the water needed to serve the District's 60,000 acres of land is covered by the Alpine decree, and the remaining needed water is covered by the Orr decree. The parties and this Court of course recognize that neither the Secretary nor this Court can adopt or require a regulation that would infringe upon these decrees, and their interpretation and application is, in a number of respects, uncertain. Nonetheless, regardless of ambiguities and inconsistencies, as the Secretary himself recognized in his own guidelines and regulations, 43 C.F.R. § 418.3 (1972), he was required to take both decrees into account. The evidence demonstrates conclusively that the Secretary formulated the regulation by totally ignoring the Alpine decree and must have reached his calculations by relying solely on larger quantities provided by the Orr Water Ditch decree.

 In addition, the evidence conclusively showed that the regulation is wholly inadequate to prevent waste within the District, causing substantial and wholly unnecessary diversion of water from the Truckee River to the obvious detriment of the Tribe. It was amply demonstrated that water could be conserved for Pyramid Lake without offending existing decrees or contractual rights of the District through better management which would prevent unnecessary waste. The amount of exposed water can be reduced to limit evaporation. Better management will lessen seepage and overflow; users can be assessed for water taken; techniques exist for measuring water more efficiently at headgates; land not entitled to water under the decrees and contract with the District can be prevented from taking the water; and by the mere employment of a few individuals the system can be so policed that it will function on a basis consistent with modern water control practices. All of this can be accomplished in spite of the fact that the District has an antiquated system. Failure to take appropriate steps, under the circumstances, by the regulation constitutes agency action unlawfully withheld and unreasonably delayed when viewed in the light of the Secretary's trust responsibilities to the Tribe, 5 U.S.C. § 706(1).

Under the contract between the Secretary and the District the Secretary has the right to require the District to conduct its affairs in a non-wasteful manner but no such action was taken or is contemplated in the regulation.[6] The

---

6. The regulation, even within its four corners, showed a disregard for close, careful management and control. The month-to-month operating criteria set out in the

operations of the District are not tightly controlled and water is taken practically on demand without necessary safeguards to prevent improper and wasteful use. This failure to act must be given particular emphasis since the proof showed that the Secretary has not in the past enforced his prior yearly regulations affecting the District and has acquiesced in excessive water deliveries to the farms. Moreover, the absence of effective enforcement provisions in the challenged regulation must be considered in the light of a formal statement by the District that it will disregard the new regulation and will divert water as it chooses by giving instructions to its own water masters (Def. Ex. 9).

■ The regulation is arbitrary, capricious, an abuse of discretion and not in accordance with law. A different basis for determining the amount of water to be diverted at Derby Dam is required. There is need to consider appropriate relief. Obviously some standard for regulating the water flow to the District must be in effect. In the approaching winter months there will be less strain than will arise commencing in early spring. It therefore appears appropriate to permit the regulation to remain in effect until February 1, 1973, and to direct appropriate action in the interim which will place the management and distribution of the water under more appropirate control before serious seasonal demands become apparent.

Accordingly, the Court directs that on or before January 1, 1973, the Secretary shall submit to this Court a proposed amended regulation which is in conformity with the findings of fact and conclusions of law set forth in this Memorandum Opinion. The amendment shall provide, among other things, an effective means to measure water use, to minimize unnecessary waste, to end delivery of water within the District to land not entitled under the decrees, and to assure compliance by the District. Proper weight shall be given to both the Orr Water Ditch and Alpine decrees and the amount of water diverted shall be wholly consistent with the Secretary's fiduciary duty to the Tribe.

■ In this connection, the Court has noted that the manner in which the Secretary chooses to manage and commit water stored in Stampede Reservoir will have an effect on the situation. Inasmuch as the contract between the Secretary and the Department of Agriculture relating to Stampede bears on this aspect of the problem, the Court notes that the contract is ambiguous in its terms and was made without consultation with the Tribe. This contract cannot be interposed as an obstacle to the Lake receiving the maximum benefit from the upper Truckee flow into Stampede which may be available under a reasonable and proper interpretation of the decrees. The Secretary's trust obligations to the Tribe are paramount in this respect.

■ In the event the amended regulation fails to assure at least the delivery of 385,000 acre feet of water to Pyramid Lake, the Secretary shall accompany the regulation with a full, detailed, factual statement of the reasons why this result has not been achieved, together with a specific itemized plan indicating what further action will be taken consistent with the Orr Water Ditch and Alpine decrees to accomplish this result in the immediate future. New construction programs to be financed with Government funds not appropriated, effective four or five years from now, will not suffice.

Counsel shall submit an appropriate order consistent with these declarations, findings of fact and conclusions of law within ten days.

regulation were prepared to accommodate a diversion of 406,000 acre feet and were not modified or adjusted when the lesser diversion of 378,000 acre feet was provided. This alone could save some 30,000 acre feet for the Tribe.

APPENDIX

[A7006]

## ORDER

This cause having duly come on for trial on the 24th, 25th and 26th days of October, 1972, proof having been presented on behalf of the respective parties, the parties having appeared by their respective attorneys, the Court being fully advised in the premises, and a Memorandum Opinion dated November 8, 1972, having been rendered incorporating the Court's Findings of Fact and Conclusions and Declarations of Law, it is hereby

Ordered, adjudged and decreed that:

1. The Operating Criteria and Procedures for the Truckee and Carson Rivers for the period November 1, 1972, through October 31, 1973, promulgated by the Secretary of the Interior on September 14, 1972, 37 Fed.Reg. 19838, are unlawful.

2. Said Operating Criteria and Procedures are hereby set aside effective February 1, 1973.

3. The Secretary of the Interior is directed to submit to the Court on or before January 1, 1973, proposed amended Operating Criteria and Procedures for the Truckee and Carson Rivers for the period ending October 31, 1973, which shall conform to the Findings of Fact and Conclusions of Law set forth in the Court's November 8, 1972, Memorandum Opinion.

4. Said amended Operating Criteria and Procedures shall be accompanied by a detailed explanation of the factors or computations which the Secretary takes into account in arriving at the maximum diversion figure set forth in said amended Operating Criteria and Procedures.

5. Said amended Operating Criteria and Procedures shall be wholly consistent with the Secretary's fiduciary duty to the plaintiff and give proper weight to the maximum farm headgate entitlements of both the Orr Water Ditch and Alpine decrees.

6. Said amended Operating Criteria and Procedures shall provide, among other things, for effective means to measure water use, to minimize unnecessary waste, to end delivery of water within the Truckee-Carson Irrigation District to land not entitled under the decrees, and to assure compliance by the District with the amended Operating Criteria and Procedures.

7. In the event the amended Operating Criteria and Procedures will fail to assure the delivery of at least 385,000 acre feet of water to Pyramid Lake for the twelve months ending October 31, 1973, the Secretary of the Interior is directed to accompany the Operating Criteria and Procedures with a full, detailed, factual statement of the reasons why this result has not been achieved, together with a specific itemized plan indicating what further action will be taken consistent with the Orr Water Ditch and Alpine decrees to accomplish this result in the immediate future.

8. The contract of June 29, 1970, between the Bureau of Reclamation and the United States Forest Service (Plaintiff's Exhibit 8) cannot be interposed as an obstacle to Pyramid Lake receiving the maximum benefit from the upper Truckee flow into Stampede Reservoir which may be available under a reasonable and proper interpretation of the applicable decrees.

9. Plaintiff shall submit any opposition to the amended Operating Criteria and Procedures on or before January 10, 1973. A hearing on the amended Operating Criteria and Procedures will be held on January 24, 1973, at 9:30 a. m. if requested by either party on or before January 15, 1973.

## MEMORANDUM

During the pendency of this litigation, the Secretary placed into effect Operating Criteria to govern the water year ending October 31, 1973, it being understood that these criteria would be subject to possible revision and change based on the determinations of the Court. The Court has today entered a Judgment and Order approving different Operating Cri-

teria which the Court finds more consistent with the Secretary's legal and fiduciary obligations to the Tribe. The parties are in accord with respect to many aspects of the approved Operating Criteria, but the Court has had to resolve controversies over other substantial portions.

This Judgement and Order is entered midway in the water year. It will not be practical to implement fully all of its provisions by October 31, 1973. Accordingly, the Court has been obliged to recognize the need for certain interim adjudgments. It has directed that the approved Operating Criteria shall be placed in full force and effect commencing with the next water year, November 1, 1973.

For the current water year the approved Operating Criteria will be generally applicable and the Secretary must take immediate steps to put them into effect. Since some aspects will require time to implement, the Court is authorizing the Secretary to divert more water to aid transition.

In selecting 350,000 acre-feet for diversion during the present water year, rather than the 288,120 acre-feet specified for the following water year, the Court has acceded to the Secretary's representations that this amount will enable a more gradual transition and in view of current weather conditions will not substantially deprive the Tribe of water for Pyramid Lake. The Tribe has not accepted the figure of 350,000 acre-feet, but did agree that more diversion than 288,129 acre-feet should be permitted for the current year. The Judgment and Order also makes certain additional changes in the approved criteria for the immediate period ahead in recognition of this larger diversion.

The Court's role in these proceedings has focused on the Operating Criteria in effect since November 1, 1971. The proof showed, however, that the Secretary has followed the practice of more or less renewing similar or identical criteria from year-to-year. As these proceedings have gone forward, the Secretary has indicated an increasing willingness to take actions in aid of Pyramid Lake. While some adjustments in Operating Criteria may be necessary after October 31, 1974, to accommodate changing conditions, there is no reason to believe from the record before the Court that the general standards established by the Court's Judgment and Order should otherwise change. The Secretary's fiduciary obligations will not alter and his continuing duty actively to supervise and upgrade the Newlands Project and to provide maximum water for Pyramid Lake will not change. It is to be hoped that new litigation can be avoided by the Secretary's assiduous attention to his responsibilities in this regard.

## JUDGMENT AND ORDER

The Court having filed its Memorandum Opinion of November 8, 1972, after giving full opportunity to the parties to fashion appropriate relief and having considered the proposed relief of each party, it is hereby

Ordered, adjudged and decreed that:

(1) The Secretary's Operating Criteria setting forth procedures for coordinating operation and control of the Truckee and Carson Rivers to provide service to the Newlands Project now in effect are arbitrary and an abuse of his discretion.

(2) The Court declares that Operating Criteria in the form attached to this Judgment and Order are necessary and appropriate to fulfill the Secretary's fiduciary and legal obligations to the Tribe.

(3) The Secretary shall immediately publish this Judgment and Order, and publish and implement and enforce the attached Operating Criteria for the water year commencing November 1, 1973, and for the current water year ending October 31, 1973, provided, however, for the current water year only, he may divert up to 350,000 acre-feet for the twelve months ending October 31, 1973, and he shall disregard the detailed provisions of Sections A and B and in lieu thereof comply with the following requirements:

A(1) 50,000 acre-feet of water presently stored in Stampede Reservoir will

be credited to the Truckee-Carson Irrigation District to be used by it in the event the water stored in Lahontan Reservoir shall fall below 80,000 acre-feet and it appears that it is necessary to draw upon this water to meet the needs within the allowable maximum total diversion of the Truckee-Carson Irrigation District for this water year.

(2) Subject to the provisions of Section A(1), diversions from the Truckee River for the Truckee-Carson Irrigation District shall be limited to the needs of the Truckee division.

(3) Maximum storage of water in Stampede Reservoir shall be required. Releases shall be limited insofar as possible consistent with existing decrees, flood control requirements and for the purposes of assisting fishery experiments as approved by the Secretary after consultation with the Tribe and the Bureau of Sport Fisheries and Wildlife.

(4) Nothing in this Judgment and Order shall constitute an interpretation or modification of either the Alpine or Orr Water Ditch decrees, nor shall it be deemed to affect the rights of any person under either of such decrees, so long as they remain in effect.

(5) Nothing in the Judgment and Order shall be deemed to prevent any change in the Operating Criteria that may be agreed between the parties, in writing, or ordered by the Court, after notice.

OPERATING CRITERIA AND PROCEDURES FOR COORDINATED OPERATION AND CONTROL OF THE TRUCKEE AND CARSON RIVERS FOR SERVICE TO NEWLANDS PROJECT

The water supply diversions to the Truckee-Carson Irrigation District from both the Truckee and Carson Rivers shall be limited to the amount needed for agricultural purposes, not exceeding 288,-129 acre-feet, if available, for the twelve months ending October 31, 1974. The water supply diversions shall be measured at the gauging station below Lahontan Dam and at diversion points along the Truckee Canal.

All use of water for power generation shall be incidental to either agricultural use or precautionary drawdown or spill.

In satisfying the diversion for agricultural purposes, maximum use will be made of Carson River water and diversions through the Truckee Canal will be minimized.

Stampede Reservoir shall be operated by the United States to provide flood control, fish and wildlife, and recreation benefits and to store water for possible agricultural use by the Truckee-Carson Irrigation District. The operation of Stampede Reservoir will be coordinated with the operation of Lake Tahoe, Prosser Creek Reservoir, and Boca Reservoir to avoid infringing upon the Floristan Rates or water rights established by existing degrees and agreements.

In all of the operations, Truckee Canal will be operated to the maximum extent practical with the objective of maintaining minimum terminal flow to Lahontan Reservoir or Carson River during all periods except when criteria herein specifically permits such deliveries. In order to minimize the rates of fluctuation in the Truckee River below Derby Dam the change of flow in Truckee Canal within any 24-hour period shall not exceed 50 cubic feet per second or 20 percent of the flow in the Truckee River below Derby, whichever is greater.

During periods of spill or precautionary drawdown of Lahontan Reservoir, the District will be charged only with the predetermined schedule of irrigation releases to be passed at the gauging station below Lahontan Reservoir plus measured diversions from the Truckee Canal and Rock Dam Ditch.

The operation of Stampede Reservoir, Derby Diversion Dam, Truckee Canal, and Lahontan Reservoir will be conducted in accordance with the following criteria in order to minimize diversions from the Truckee River through the Truckee Canal.

## SECTION A
### Truckee Diversion Criteria

Subject to conditions specified in Section B (Storage Credit at Stampede), the diversions of water from the Truckee River into and through the Truckee Canal will be governed by the following criteria:

(1) If available, sufficient water will be diverted into Truckee Canal to meet direct agricultural requirements along the Truckee Canal.

(2) Diversions through the Truckee Canal into Lahontan Reservoir will be made in accordance with the following tabulation:

| Operating month | If accumulated precipitation from Oct. 1 to date at Tahoe City, Calif. is: | | Continue Truckee Canal Diversion to Lahontan Reservoir if storage is less than upper limit | | | |
|---|---|---|---|---|---|---|
| | | | Lower limit[1] | | Upper limit | |
| November –March | | Inches | Elev. | Ac.Ft. | Elev. | Ac.Ft. |
| November 1 | Less than | 5.00 | 4123.3 | 60,000 | 4124.3 | 63,000 |
| | Equal or Greater than | 5.00 | 4103.6 | 20,000 | 4105.8 | 23,000 |
| December 1 | Less than | 5.00 | 4129.3 | 80,000 | 4130.1 | 83,000 |
| | Between | 5.00 & 10.70 | 4123.3 | 60,000 | 4124.3 | 63,000 |
| | Greater than | 10.70 | 4115.4 | 40,000 | 4116.8 | 43,000 |
| January 1 | Less than | 10.70 | 4138.5 | 120,000 | 4139.1 | 123,000 |
| | Between | 10.70 & 16.80 | 4131.8 | 90,000 | 4132.6 | 93,000 |
| | Greater than | 16.80 | 4123.3 | 60,000 | 4124.3 | 63,000 |
| February 1 | Less than | 16.80 | 4145.8 | 160,000 | 4146.3 | 163,000 |
| | Between | 16.80 & 22.10 | 4138.5 | 120,000 | 4139.1 | 123,000 |
| | Greater than | 22.10 | 4129.3 | 80,000 | 4130.1 | 83,000 |
| March 1 | Less than | 22.10 | 4151.8 | 200,000 | 4152.2 | 203,000 |
| | Between | 22.10 & 26.10 | 4144.1 | 150,000 | 4144.6 | 153,000 |
| | Greater than | 26.10 | 4134.2 | 100,000 | 4134.9 | 103,000 |
| | If forecasted runoff plus existing storage on April 1 is: | | | | | |
| April– October | | Ac.Ft. | Elev. | Ac.Ft. | Elev. | Ac.Ft. |
| April 1 | Greater than | 350,000 | No diversion to Lahontan thru October | | | |
| | Between | 250,000 & 350,000 | 4154.3 | 220,000 | 4154.7 | 223,000 |
| | Less than | 250,000 | 4159.8 | 270,000 | 4160.1 | 273,000 |
| May 1 | Between | 250,000 & 350,000 | 4151.8 | 200,000 | 4152.2 | 203,000 |
| | Less than | 250,000 | 4162.6 | 300,000 | 4162.8 | 303,000 |
| June 1 | Between | 250,000 & 350,000 | 4144.1 | 150,000 | 4144.6 | 153,000 |
| | Less than | 250,000 | 4157.7 | 250,000 | 4158.1 | 253,000 |
| July 1 | Between | 250,000 & 350,000 | 4134.2 | 100,000 | 4134.9 | 103,000 |
| | Less than | 250,000 | 4145.8 | 160,000 | 4146.3 | 163,000 |
| August 1 | Between | 250,000 & 350,000 | 4129.3 | 80,000 | 4130.1 | 83,000 |
| | Less than | 250,000 | 4131.8 | 90,000 | 4132.6 | 93,000 |
| Sept 1 | Less than | 350,000 | 4119.7 | 50,000 | 4120.8 | 53,000 |
| October 1 | Less than | 350,000 | 4115.4 | 40,000 | 4116.8 | 43,000 |

1. Truckee Canal Diversion to Lahontan Reservoir should be started only when storage recedes below lower limit.

## SECTION B
### Storage Credit at Stampede

As a means of minimizing the diversions of Truckee River water for use on the Carson Division of the Truckee-Carson Irrigation District or for storage in Lahontan Reservoir and at the same time ensuring that the District shall receive exactly the same total amount of water for its beneficial use as otherwise, the following modifications shall be applied to the criteria in Section A (Truckee Diversion Criteria):

(1) The storage levels in Lahontan Reservoir specified as limits for starting and stopping diversions of water for storage in Lahontan or use on the Carson Division shall be converted to acre-feet and applied to the sum of water in storage at Lahontan Reservoir and water in Stampede Reservoir credited to the Truckee-Carson Irrigation District using the most up-to-date area-capacity curve for each reservoir.

(2) The combined storage facilities on the upper Truckee River will be operated in a manner consistent with the applicable decrees and so as to maintain the Floristan Rates with the objective of maximizing the accumulation of storage in Stampede Reservoir.

(3) Whenever there is an adequate amount of uncommitted water in Stampede Reservoir the Truckee-Carson Irrigation District shall forego the diversion of water into the Truckee Canal for storage in Lahontan Reservoir or for use on the Carson Division and shall accept credit in Stampede Reservoir for the amount of water it otherwise would have diverted. For the purposes of this subsection, an adequate amount of uncommitted water (consisting of not less than 50,000 acre-feet) will be deemed to have accumulated in Stampede Reservoir no later than February 1, 1974.

(4) The sum of the amount of water stored in Lahontan Reservoir plus the amount of water stored in Stampede Reservoir and credited to the Truckee-Carson Irrigation District shall not be allowed to exceed the storage capacity of Lahontan Reservoir below elevation 4163.67 feet above mean sea level (317,- 300 acre-feet), and this limit shall be preserved, if necessary, by the reduction of credit in Stampede Reservoir. When the amount of water credited to the Truckee-Carson Irrigation District is so reduced, the amount of that reduction shall be credited for the purpose of maintaining the minimum rates of flow below Derby Dam provided in Section B(7) of these Operating Criteria and Procedures.

(5) Whenever the water surface elevation of Lahontan Reservoir is at or below elevation 4129.28 feet (80,000 acre-feet) above mean sea level during the irrigation season, water will be released from Stampede Reservoir to be diverted into and through the Truckee Canal for agricultural use by the Truckee-Carson Irrigation District in either or both the Truckee and Carson Divisions. The total amount of the release shall be limited to the lesser of the amount credited to the Truckee-Carson Irrigation District or the amount needed to supplement the 80,000 acre-feet of water in Lahontan Reservoir to meet the remaining seasonal agricultural requirements of the Truckee-Carson Irrigation District.

(6) From February 1, 1974, the District will be credited with an initial 50,000 acre-feet of water in Stampede. In addition to this amount, the District will be credited with the accumulated storage in excess of 5915.0 feet above mean sea level (127,600 acre-feet) in accordance with B(3) above.

(7) Insofar as possible consistent with existing decrees and with maintaining the Floristan Rates and with Operating Criteria and Procedures Sections B(1) through B(6), Stampede Reservoir (as well as the other storage facilities on the upper Truckee River) shall be operated with the objective of maintaining the following minimum rates of flow for fish, wildlife and recreation purposes in the Truckee River below Derby Dam measured at the Nixon gauge:

| | |
|---|---|
| March 1–May 15 | 600 cubic feet per second |
| May 16–September 15 | 300 cubic feet per second |
| September 16–February 28 | 150 cubic feet per second |

(8) At the conclusion of the water year, October 31, 1973, the District shall retain as minimum carry-over credit in

Stampede Reservoir for the 1974 water year the quantity of Truckee River water that it would have been able to divert to Lahontan Reservoir in the absence of its storage credit at Stampede. In addition, the Secretary of the Interior, in consultation with the Pyramid Lake Paiute Tribe of Indians and the Bureau of Sport Fisheries and Wildlife with respect to the requirements of the Pyramid Lake fishery, will determine: (1) the portion of the remaining storage in Stampede Lake allocated for releases to Pyramid Lake, and (2) the portion of the remaining storage in Stampede Reservoir to be allocated to the District as additional carry-over storage credit for the 1974 water year.

(9) Nothing in sections B(1) through B(8) of these Operating Criteria and Procedures shall in any way infringe on or interfere with the flood control function of Stampede Reservoir.

## SECTION C

As a means of insuring that the amount of water diverted is limited to that prescribed for beneficial agricultural use, the Truckee-Carson Irrigation District shall:

(1) Deliver water only to lands for which the District has in advance established to the satisfaction of the Secretary or his designee that a current valid water right exists.

(2) Establish a single water operations center which will coordinate all orders for delivery of water to individual turnouts and which then will dispatch flows in the distribution systems so as to meet the water orders with minimum spill from the distribution system.

(3) Permit only authorized District employees to open and close individual turnouts and operate the distribution system facilities.

(4) Establish and operate sufficient stations for the measurement of all surface waters flowing out of the Truckee, North Carson, and South Carson Divisions.

(5) Initiate immediately a program for improving the measurement of the amounts of water delivered to individual turnouts. The program shall include the installation of measuring devices on at least 10 percent of the total turnouts in 1973; the program shall concentrate first on the combinations of large users and currently poor measurements; and the installed devices must be approved by the U. S. Geological Survey and the Bureau of Reclamation.

(6) Submit to the Project Office of the Bureau of Reclamation a monthly report by the 15th of the following month for each of the three divisions showing the total water delivery in acre-feet and the maximum, minimum and mean daily outflow in cubic feet per second. Reports showing the amount of water in acre-feet delivered to each farm each month during the water year shall be made at least twice during the calendar year. These reports shall be circulated to the Tribe and the members of the Truckee-Carson Operating Criteria and Procedures Committee.

(7) By June 30, 1973, establish a system, to become effective November 1, 1973, for charging water users for the quantity of water delivered to their turnouts. The system shall be designed: (a) to provide a reasonable financial incentive for economical and efficient use of water; and (b) to produce revenue against the District's operation and maintenance expenses and to assist the discharge of its debt to the United States.

## SECTION D

(1) Article 32 of the December 18, 1926, contract between the United States and the District will be invoked by the Secretary for substantial violations of these Operating Criteria and Procedures and the Secretary reserves all other rights and options to enforce these criteria.

(2) If the Secretary determines that waste has occurred through negligence or inattention, after written notice the amount of such waste shall be deducted from the District's allowable maximum total diversion.

(3) The District shall not deliver water to users who do not comply with all of the terms and provisions of these Operating Criteria and Procedures. Such deliveries shall not resume without the prior approval of the Secretary or his designee.

(4) The Secretary shall not approve any applications for transfers of water rights within the Newlands Project pursuant to 43 U.S.C. § 439 unless he finds that the District is in compliance with all of the terms and provisions of these Operating Criteria and Procedures and that the applicants for such transfers are in compliance with these Operating Criteria and Procedures and with the applicable decrees. Transfers of water rights shall be restricted to the extent that there shall be no enlarged consumptive use of water within the lands of the Newlands Project.

(5) All of the water delivery operations of the Truckee-Carson Irrigation District shall be monitored closely by the Bureau of Reclamation. Any and all violations of the terms and provisions of these Operating Criteria and Procedures shall be reported immediately by the District to the Project Office of the Bureau of Reclamation.