**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PYRAMID LAKE PAIUTE TRIBE OF
INDIANS; UNITED STATES OF
AMERICA,
              *Plaintiffs-Appellees*,

v.

STATE OF NEVADA, DEPARTMENT OF
WILDLIFE; NEVADA WATERFOWL
ASSOCIATION,
              *Respondents*,

and

NEVADA STATE ENGINEER,
              *Defendant-Appellant*.

No. 11-16470

D.C. No.
3:73-cv-00201-
LDG

PYRAMID LAKE PAIUTE TRIBE OF
INDIANS; UNITED STATES OF
AMERICA,
            *Plaintiffs-Appellees*,

v.

NEVADA WATERFOWL
ASSOCIATION,
                *Respondent*,

NEVADA STATE ENGINEER,
                *Defendant*,

and

STATE OF NEVADA, DEPARTMENT OF
WILDLIFE,
            *Respondent-Appellant*.

No. 11-16475

D.C. No.
3:73-cv-00201-
LDG

PYRAMID LAKE PAIUTE TRIBE OF INDIANS; UNITED STATES OF AMERICA,

*Plaintiffs-Appellees*,

v.

STATE OF NEVADA, DEPARTMENT OF WILDLIFE,

*Respondent*,

NEVADA STATE ENGINEER,

*Defendant*,

NEVADA WATERFOWL ASSOCIATION,

*Respondent-Appellant*.

No. 11-16482

D.C. No. 3:73-cv-00201-LDG

OPINION

Appeal from the United States District Court
for the District of Nevada
Lloyd D. George, Senior District Judge, Presiding

Argued and Submitted
April 18, 2013—San Francisco, California

Filed July 30, 2013

Before: Mary M. Schroeder, Sidney R. Thomas,
and Barry G. Silverman, Circuit Judges.

Opinion by Judge Thomas

# SUMMARY[*]

## Water Rights

Affirming the district court's judgment, the panel held that the district court correctly concluded that diversion of water for waterfowl habitat is not "irrigation" within the meaning of the federal court *Alpine* decree governing water rights in the Newlands Reclamation Project.

This appeal concerns applications filed by the Nevada Department of Wildlife and the Nevada Waterfowl Association to transfer water rights from agricultural land in the Newlands Project to the Carson Lake and Pasture, a wildlife refuge located within the Lahontan Valley wetlands at the terminus of the Carson River. Because the applicants proposed to use the transferred water to support the growth of plants used by wildlife, they argued that the intended use of water at Carson Lake and Pasture constituted irrigation. The Pyramid Lake Paiute Tribe and the United States protested the applications.

Determining that the Tribe had standing, the panel held that both the Alpine Decree and the Nevada water code speak of irrigation solely in the context of agriculture and distinguish such use from the application of water for recreational, aesthetic, and wildlife purposes. Therefore, the panel agreed with the district court that the State Engineer's approval of the applications to transfer the non-consumptive use portion of the applicants' water rights violated

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Administrative Provision VII of the *Alpine* Decree because the applications sought a change in the manner of use to a non-irrigation purpose.

---

## COUNSEL

Bryan L. Stockton, Senior Deputy Attorney General, Carson City, Nevada, for Defendant-Appellant Nevada State Engineer.

Nhu Q. Nguyen, Senior Deputy Attorney General, and Kristen R. Geddes (argued), Deputy Attorney General, Carson City, Nevada, for Respondent-Appellant Nevada Department of Wildlife.

Paul G. Taggart (argued) and Alexander E. Drew, Taggart & Taggart, Ltd., Carson City, Nevada; Jim C. Giudici, McDonald, Carano, Wilson, LLP, Reno, Nevada, for Respondent-Appellant Nevada Waterfowl Association.

Fred Disheroon, Stephen M. MacFarlane, John L. Smeltzer, and Katherine J. Barton (argued), United States Department of Justice, Washington, D.C., for Plaintiff-Appellee United States of America.

Don Springmeyer and Christopher W. Mixson, Wolf, Rifkin, Shapiro, Schulman and Rabkin, LLP, Las Vegas, Nevada, for Plaintiff-Appellee Pyramid Lake Paiute Tribe of Indians.

---

**OPINION**

THOMAS, Circuit Judge:

Almost from the time that explorers John C. Frémont and Kit Carson first came upon the Truckee River and Pyramid Lake,[1] disputes have arisen about water rights. In this latest chapter in a hundred-year litigation history, *see Nevada v. United States*, 463 U.S. 110, 113 (1983) (summarizing history), we consider whether diverting water to wetlands in order to sustain wildlife habitat constitutes "irrigation." We conclude that, within the meaning of the federal court decree governing water rights in the Newlands Reclamation Project, it does not, and we affirm the judgment of the district court.

**I**

Two rivers flow through the Truckee River Basin, which straddles the California-Nevada border in one of the nation's most arid regions: the Truckee and the Carson. The Carson River "rises on the eastern slope of the High Sierra in Alpine County, California, and flows north and northeast over a course of about 170 miles, finally disappearing into Carson sink." *Id.* at 115. The Truckee River originates in Lake Tahoe, flows north and east into Nevada, and terminates in

---

[1] Frémont named the lake after a pyramid-shaped island in it. Arthur C. Benke and Colbert E. Cushing, *Rivers of North America* 3 (2005). He and Carson originally named the Truckee River as the Salmon Trout River after the huge Lahontan cutthroat trout that ran up the river from Pyramid Lake to spawn. The river was ultimately named after a Paiute chief. State of Nevada Division of Water Resources, *A Chronological History of Lake Tahoe and the Truckee River and Related Water Issues* (2013), *available at* http://water.nv.gov/mapping/chronologies/truckee/part2.cfm (last visited July 22, 2013).

Pyramid Lake, for which it provides the sole source of water. *United States v. Alpine Land & Reservoir Co.*, 878 F.2d 1217, 1219 (9th Cir. 1989) (*Alpine II*).

Pyramid Lake is "widely considered the most beautiful desert lake in North America . . . ." *Nevada*, 463 U.S. at 114 (internal quotation marks and citation omitted). It lies entirely within the reservation of the Pyramid Lake Paiute Tribe (the "Tribe") and is the Tribe's "aboriginal home." *Alpine II*, 878 F.2d at 1219. Historically, Pyramid Lake supported a world-famous fishery of Lahontan cutthroat trout and cui-ui sucker fish. *Nevada*, 463 U.S. at 114-15, 119 n.7. Over the course of the twentieth century, however, diversion of Truckee River water for agricultural use caused a dramatic reduction in the lake's surface area. *Alpine II*, 878 F.2d at 1220. As a result, a delta formed at the mouth of the Truckee River, choking off access to spawning grounds used by Pyramid Lake's native fish populations and driving them to the brink of extinction. *Id.*

The large-scale diversion of water for agricultural use in the Truckee River basin is facilitated by the Newlands Project (the "Project"), one of the first federal reclamation efforts commenced under the authority of the Reclamation Act of 1902, ch. 1093, 32 Stat. 388, *codified at* 43 U.S.C. §§ 371–600e. The Reclamation Act gave the federal government "a prominent role in the development of the West," by authorizing the Secretary of the Interior "to withdraw from public entry lands in specified western States, reclaim the lands through irrigation projects, and then to restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself." *Nevada*, 463 U.S. at 115. Pursuant to this authority, the Secretary withdrew from the public domain approximately 232,800

acres of land in western Nevada to establish the Newlands Project. *United States v. Alpine Land & Reservoir Co.*, 291 F.3d 1062, 1066 (9th Cir. 2002) (*Alpine V*). The Project "was designed to irrigate a substantial amount of this land with water from the Truckee and Carson Rivers, thereby turning wasteland into farmland." *Alpine II*, 878 F.2d at 1220 (footnote omitted).

Lands served by the Project are divided into the "Truckee Division" and the "Carson Division." *United States v. Alpine Land & Reservoir Co.*, 887 F.2d 207, 208 (9th Cir. 1989) (*Alpine III*). At the Derby Diversion Dam east of Sparks, Nevada, part of the Truckee River's flow is diverted from its natural course to Pyramid Lake. *Id.* A portion of that diverted water supplies irrigators in the Truckee Division; the remainder is impounded in the Lahontan Reservoir and released into the Carson River to supply irrigators in the Carson Division. *Id.* "Because diversions from the Carson River do not directly affect Pyramid Lake, the Tribe has sought and obtained judicial rulings that Carson River flows should be utilized whenever possible, before Truckee River flows, to supply the Project with its necessary water." *Id.* at 210 n.2 (citing *Pyramid Lake Paiute Tribe of Indians v. Morton*, 354 F. Supp. 252 (D. D.C. 1973)). Thus, we have acknowledged that decreasing water demand in the Carson Division correspondingly decreases the quantity of Truckee River water used there, which in turn increases flows to Pyramid Lake. *Id.*

Two federal court decrees—products of suits by the United States to quiet title to Truckee and Carson River water—govern water rights in the Newlands Project. The *Orr Ditch Decree*, In Equity Dkt. No. A3, slip op. (D. Nev. Sept.

8, 1944), allocates water rights on the Truckee River,[2] while the *Alpine* Decree, Civil No. D-183, slip op. (D. Nev. Oct. 28, 1980), governs the Carson River water rights at issue in this appeal.[3] The *Alpine* Decree establishes "water duties" for different categories of irrigable lands within the Project, which articulate the maximum quantity of Project water that a landowner may apply to a particular parcel. The water duty for the Project bottom lands at issue in this appeal is 3.5 acre-feet per acre ("afa"), while the duty for higher-elevation "bench lands" is 4.5 afa. *United States v. Alpine Land & Reservoir Co.*, 503 F. Supp. 877, 888 (D. Nev. 1980). These figures are based on the quantity of water needed to grow alfalfa, the dominant crop in the Newlands Project. *Id.* Because some water is inevitably lost to evaporation or during transport, the water duties are set somewhat higher than the quantity of water actually taken up by the alfalfa plants. Specifically, the 3.5 afa water duty at issue in this case includes a "consumptive use" portion of 2.99 afa—which accounts for the quantity of water actually consumed by crop growth—plus a "non-consumptive use" portion of 0.51 afa. *Id.*

---

[2] Under the *Orr Ditch* Decree, the Pyramid Lake Paiute Tribe has the right to divert 58.7 second feet and 12,412 acre feet of water per year from the Truckee River to irrigate Reservation lands. *Nevada*, 463 U.S. at 117–18. The United States has the right to divert 1,500 cubic feet per second to irrigate land within the Newlands Project. *Id.*

[3] The *Alpine* Decree allocates the full flow of the Carson River above Lahontan Dam to the United States for distribution to landowners in the Newlands Project. *See United States v. Alpine Land & Reservoir Co.*, 503 F. Supp. 877 (D. Nev. 1980). The Tribe has no decreed water rights in the Carson River.

The *Alpine* Decree also establishes rules for transferring decreed water rights to new locations and uses within the Project. *Alpine V*, 291 F.3d at 1066–67. Of significance to this appeal, Administrative Provision VII of the Decree states that a party may only transfer the consumptive use portion of its water right to a use other than irrigation.[4] *See Alpine Land & Reservoir Co.*, 503 F. Supp. at 893. Thus, a landowner in the Project's bottom lands who applies to change the manner of use for an irrigation water right can only apply 2.99 afa to the new use; the 0.51 afa non-consumptive use portion must stay in the river. This limitation is designed to protect the efficiency benefits of the "return-flow" method of irrigation practiced in the Newlands Project. *Id.* Under this method, water is diverted into centralized ditches or canals, applied to the land of the most senior appropriator,[5] and then allowed to run or seep onto adjacent parcels or into another diversion canal. *Id.* at 891–92. The *Alpine* Decree court found this method more efficient than irrigation by direct diversions to each landowner via individual irrigation ditches. *Id.* at 892. It also found that allowing holders of irrigation water rights to change the manner of use to a non-irrigation purpose would

---

[4] Administrative Provision VII states, in relevant part, that "[c]hange in manner of use applications from use for irrigation to any other use . . . shall be allowed only for the net consumptive use of the water as determined by this Decree." *Alpine* Decree, Civil No. D-183, slip op. at 161–62.

[5] Under the Western water law maxim of "first in time, first in right," landowners who secure water rights earlier in time—so-called "senior" rights-holders—are entitled to take their share of water in times of scarcity before those with later-secured "junior" rights. *E.g.*, Charles F. Wilkinson, *Western Water Law in Transition*, 56 U. Colo. L. Rev. 317, 319–20 (1985).

undermine the efficacy of the return-flow method by transferring the 0.51 afa non-consumptive use portion of those rights—which previously reached downstream users as return flows—to a consumptive use. *Id.* at 893. To address this issue, Administrative Provision VII's prohibition on transferring the non-consumptive use portion of irrigation rights to other uses ensures that "[w]ater that has been allowed in the duties for purposes of irrigation coverage could not then be changed to a consumptive use and disappear from the return flows to other water right lands or the river." *Id.*

Under the *Alpine* Decree, the Nevada State Engineer adjudicates applications to change the manner of use, place of use, or place of diversion for decreed water rights according to Nevada law. *Id.* However, the U.S. District Court for the District of Nevada, which issued the *Alpine* Decree, retains jurisdiction over challenges to the State Engineer's decisions on change applications. *Id.*; Nev. Rev. Stat. § 533.450(1).

# II

This appeal concerns applications filed by the Nevada Department of Wildlife ("the Department") and the Nevada Waterfowl Association ("the Association") to transfer water rights from agricultural land in the Newlands Project to the Carson Lake and Pasture, a wildlife refuge located within the Lahontan Valley wetlands at the terminus of the Carson River.[6] Like Pyramid Lake, the Lahontan Valley wetlands have suffered from the systematic diversion of water to

---

[6] The Department manages the wildlife refuge at Carson Lake and Pasture under an agreement with the United States Department of the Interior.

landowners in the Newlands Project. *See United States v. Alpine Land & Reservoir Co.*, 341 F.3d 1172, 1176 (9th Cir. 2003) (*Alpine VII*) (describing impacts).

Historically, the Carson River supported an average of 150,000 acres of wetlands, which provided important habitat for waterfowl, shorebirds, and other wildlife. "The Project, however, altered the natural hydrological flow in the wetlands, as flooding that had previously sent springtime flows down the Carson River into the marshes was contained and diverted into Project irrigation canals for delivery to newly created farmlands in the Carson Division of the Project." *Id.* As a result, "the Lahontan Valley wetlands and marshes largely dried up." *Id.* (citing *Churchill Cnty. v. Norton*, 276 F.3d 1060, 1068 (9th Cir. 2001)). To stave off further habitat loss, Congress authorized the Secretary of the Interior and Nevada conservation agencies to acquire and transfer water rights from willing landowners in the Newlands Project to the wetlands. *See id.* at 1176–77.

At issue are three applications submitted by the Department and the Association (collectively, the "Applicants") to the State Engineer to transfer water rights from agricultural lands in the Carson Division to Carson Lake and Pasture to sustain wildlife habitat. The Applicants contend that they seek only to change the water's *place* of use, but not its *manner* of use. Because they propose to use the transferred water to support the growth of plants used by wildlife,[7] they argue that the intended use of water at Carson Lake and Pasture constitutes irrigation. Relying on this

---

[7] The plants the Applicants wish to cultivate at Carson Lake and Pasture include Sago pond weed, widgeon grass, alkalai bulrush, saltgrass, hard stem bulrush, red goosefoot, smart weeds, and water grass millets.

theory, the Applicants sought to transfer both the consumptive and non-consumptive use portions of the water rights at issue.[8]

The Tribe and the United States protested the applications before the State Engineer,[9] claiming that the applications violate Administrative Provision VII of the *Alpine* Decree because they seek to transfer the non-consumptive use portion of agricultural irrigation rights to a non-irrigation use, namely, use for "recreation, wildlife and/or the maintenance and preservation of wetlands." The State Engineer rejected this argument, finding that the Applicants' proposed use of water at Carson Lake and Pasture "can be described as irrigation" because it involves "the provision of water for plant growth." Because he found that the applications do not seek to change the manner of use from irrigation to another category, the State Engineer approved the applications to transfer the full water duty for the rights at issue.

The Tribe and the United States sought review of the State Engineer's decision in the U.S. District Court for the District of Nevada, invoking its reserved jurisdiction under the *Alpine* Decree. *See United States v. Alpine Land &*

---

[8] The Association filed applications 71775 and 73574, which both seek to transfer the full 3.5 afa water duty from agricultural use on private lands within the Project to Carson Lake and Pasture. In application 73444, The Department seeks to transfer only the 0.51 afa non-consumptive use portion of the rights at issue because the non-consumptive use portion was transferred under an earlier application.

[9] Due to administrative oversight, the United States joined the Tribe in protesting only one of the three transfer applications at issue. However, since all three applications raise the same legal issue, that fact is not material to this appeal.

*Reservoir Co./Churchill Cnty. v. Turnipseed*, 174 F.3d 1007, 1011 (9th Cir. 1999) (affirming that, in the *Alpine* Decree, the district court reserved jurisdiction to review adjudications of transfer applications for decreed water rights). The district court held that the Applicants' proposed use of water at Carson Lake and Pasture is not "irrigation" within the meaning of the *Alpine* Decree. *United States v. Alpine Land & Reservoir Co.*, 788 F. Supp. 2d 1209, 1219 (D. Nev. 2011). It explained that,

> [t]aken as a whole, the *Alpine Decree*'s references to irrigation establish that the only irrigation use contemplated by the *Decree* was for agriculture, whether for productively growing valuable cash crops or for pasture lands. While the word "irrigation" can be defined as any application of a liquid, the *Alpine Decree* considered and referred to irrigation use in the context of agriculture, and specifically to grow cash crops and pasture. The decree court itself recognized that one of its central tasks was to establish a water duty to irrigate farmlands.

*Id.* at 1217 (footnote omitted). The district court also observed that Nevada law, which the *Alpine* Decree incorporates as the source of substantive water law, defines "wildlife purposes" as a distinct use of water. *Id.* at 1218 (citing Nev. Rev. Stat. § 533.023).[10] It concluded that the

---

[10] That provision defines "wildlife purposes" to "include[] the watering of wildlife and the establishment and maintenance of wetlands, fisheries and other wildlife habitats." Nev. Rev. Stat. § 533.023. There is no statutory definition of "irrigation" under Nevada law.

Applicants' proposed use of water falls within the state law definition of "wildlife purposes," which further evidences that it is not "irrigation." *Id.* Thus, the district court reversed the decision of the State Engineer and vacated his approval of the transfer applications. *Id.* at 1219.

This timely appeal followed.

### III

At the outset, the Association argues that the Tribe lacks standing under Article III and the *Alpine* Decree because it does not allege injury to its decreed water rights. The Association is correct that the Tribe lacks water rights under the *Alpine* Decree, and its rights to Truckee River water under the *Orr Ditch* Decree are not threatened by the State Engineer's decision in this case. However, the Tribe satisfies the constitutional standing requirement by plausibly alleging that the Applicants' proposed transfer of water rights to Carson Lake and Pasture will increase demand for Truckee River water in the Carson Division and thereby diminish flows to Pyramid Lake. Moreover, the Tribe properly invoked the district court's reserved jurisdiction to review adjudications of water rights under the *Alpine* Decree.

It is well established that "the irreducible constitutional minimum of standing contains three elements": (1) a concrete and particularized injury that is "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's challenged conduct; and (3) a likelihood that a favorable decision will redress that injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). Only the first of these elements is at issue, and the Tribe's allegation

that the State Engineer's decision will increase demand for Truckee River water in the Carson Division and thereby reduce flows to Pyramid Lake establishes a cognizable injury. The Association does not dispute the *Alpine* Decree court's finding that reducing return flows in the Carson Division diminishes irrigation efficiency, *Alpine Land & Reservoir Co.*, 503 F. Supp. at 892, which prompts increased diversions from the Truckee River and reduces flows to Pyramid Lake, *Alpine III*, 887 F.2d at 210 n.2. And the Tribe's interest in maximizing flows to Pyramid Lake—which lies entirely within the boundaries of the Tribe's reservation and is central to its cultural and economic life—is well established. *See, e.g.*, *Alpine III*, 887 F.2d at 208 (recognizing that, "[b]ecause any water diverted from the Truckee cannot be recovered for use at the Tribe's fishery at Pyramid Lake, the Tribe is vitally interested in limiting the diversion of Truckee River water"). That the individual permitting decisions at issue in this case may have a de minimis impact on flows to Pyramid Lake does not defeat the Tribe's standing. *See id.* at 214 (recognizing the Tribe's standing to challenge individual adjudications by the State Engineer that cumulatively affect the Tribe's interests in the Truckee River and Pyramid Lake).[11]

---

[11] Refusing to recognize the Tribe's standing because of the de minimis impact of individual permit decisions would, as a practical matter, leave the Tribe without recourse to protect its interest in maximizing flows to Pyramid Lake. As we explained in *Alpine III*, individual adjudications that incrementally increase diversions from the Truckee River can effect a death by a thousand cuts for Pyramid Lake. *See Alpine III*, 887 F.2d at 214 (recognizing that "the total effect on the Tribe's water rights is ultimately the sum of the individual parts"). Moreover, the Applicants admit that this is a test case and, if successful, they intend to transfer thousands of acre-feet of additional water under the same theory. The only way the Tribe can challenge the potential loss of thousands of acre-

In addition, the Tribe properly invoked the district court's reserved jurisdiction to review the State Engineer's adjudication of decreed water rights. In *Orr Ditch IV*, we held that the district court lacks jurisdiction to review the State Engineer's adjudication of *non-decreed* water rights unless the plaintiff alleges injury to its decreed water rights. *Orr Ditch IV*, 600 F.3d at 1160. Since the district court's reserved jurisdiction over the State Engineer's decisions is "an adjunct to its jurisdiction over the quiet title action" that spawned the Decree, *Alpine II*, 878 F.2d at 1219 n.2, that jurisdiction is necessarily limited to review of the Engineer's decisions that affect rights granted under the Decree. Here, however, the plaintiffs need not allege injury to their decreed water rights because the challenged transfer applications concern decreed water rights. Having cleared the constitutional standing hurdle, the Tribe is free to invoke the district court's undisputed jurisdiction to review decisions of the State Engineer that concern decreed water rights.[12]

## IV

The sole issue on the merits is whether the Applicants' proposed use of water at Carson Lake and Pasture constitutes "irrigation" within the meaning of the *Alpine* Decree. We review the district court's interpretation of the *Alpine* Decree *de novo*. *United States v. Orr Water Ditch Co.*, 914 F.2d

---

feet of water that would otherwise reach Pyramid Lake is to challenge the State Engineer's approval of individual transfer applications.

[12] Even if the Association were correct that the Tribe cannot invoke the district court's *Alpine* Decree jurisdiction in this case, jurisdiction would be proper under 28 U.S.C. § 1345, which vests district courts with original jurisdiction in all civil actions commenced by the United States.

1302, 1307 (9th Cir. 1990) (*Orr Ditch I*). Whether we rely on the language and history of the *Alpine* Decree itself or the provisions of Nevada law incorporated therein, we agree with the district court that the proposed use of water is not irrigation.

Though it does not define "irrigation," the *Alpine* Decree expresses a singular concern with the provision of irrigation water for agricultural use, and its references to irrigation uniformly relate to agriculture. For instance, the Decree's first administrative provision states that the lands in the Newlands Project "are dry and arid and irrigation is necessary *for the production of valuable crops thereon*." *Alpine* Decree, Civ. No. D-183, slip op. at 157 (emphasis added). Consistent with this finding, decreed water rights are based on the quantity of water "necessary and sufficient for the reasonable and economical irrigation of crops thereon." *Id.* In its accompanying opinion, the district court stated that one of its "central tasks" in fashioning the *Alpine* Decree was to "establish a clear and specific water duty for both the Newlands Project farmlands and the upper Carson farmlands." *Alpine Land & Reservoir*, 503 F. Supp. at 887. The Applicants fail to identify any language in the Decree or accompanying opinion suggesting that the Decree's references to irrigation encompass anything more than the application of water to cultivate crops for human or livestock consumption.

Based on this language, we have similarly described the purpose of the Newlands Project and the governing decrees as facilitating *agricultural* irrigation. *See, e.g.*, *Alpine VI*, 340 F.3d at 907 (stating that "[t]he Project was intended to convert some of the country's most arid land into irrigated farmland . . . ."); *Alpine V*, 291 F.3d at 1066 (stating that

"[t]he Project was designed to irrigate a substantial area . . . *in order to facilitate its conversion to farmland*") (emphasis added); *Alpine II*, 878 F.2d at 1220 (citations and footnote omitted) (describing the Project's purpose as "turning wasteland into farmland" by "irrigat[ing] a substantial amount of [the Project] land with water from the Truckee and Carson Rivers . . . ."); *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 860 (9th Cir. 1983) (*Alpine I*) (stating that the Project's Lahontan reservoir, "as a project built under the federal Reclamation Act, was intended for the primary benefit of the farmers who would use its waters for irrigation . . . . ."). We find no contrary evidence that would support our departure from this longstanding interpretation.[13]

---

[13] Though not addressing the Newlands Project specifically, decisions of the Nevada Supreme Court and the United States Supreme Court likewise equate "irrigation" with agricultural use. *See, e.g.*, *United States v. California*, 438 U.S. 645, 648–49 (1978) (describing the origins of modern irrigation in Mormon pioneers' cultivation of potatoes); *id.* at 651 (distinguishing the use of water for "irrigation" from use for "the protection of fish and wildlife"); *Prosole v. Steamboat Canal Co.*, 140 P. 720, 722–23 (Nev. 1914) (equating an "irrigation" right with "a water right for agricultural purposes" and describing the purpose of water law as facilitating "the actual economic application of the exceedingly scarce, but all-important element, water to the soil, with the end in view that the latter may perform its highest function in producing sustenance *for humanity*") (emphasis added). Similarly, water law scholars consistently equate irrigation with agriculture and distinguish irrigation from the use of water for wildlife, recreation, or aesthetic purposes. *See, e.g.*, A. Dan Tarlock, *The Future of Prior Appropriation in the West*, 41 Nat. Res. J. 769, 770, 772 (2001) (describing the goal of federal reclamation as "settl[ing] the West with irrigated family farms," and distinguishing agricultural irrigation rights, which are the "core" concern of Western water law, from contemporary uses of water for urban and environmental purposes).

Moreover, the undisputed facts indicate that the Applicants' proposed use of water at Carson Lake and Pasture constitutes a "wildlife" use under Nevada law, which is a distinct use from irrigation. *See State v. Morros*, 766 P.2d 263, 268 (Nev. 1988) (stating that wildlife watering is encompassed within the state law definition of recreation as a beneficial use of water). Nevada law governs "both the process and the substance of a proposed transfer of water rights" under the *Alpine* Decree, *Alpine II*, 878 F.2d at 1223, and defines the "beneficial uses" to which Project water may be put, *Alpine I*, 697 F.2d at 854. Thus, we look to the Nevada water code to determine whether the Applicants in fact propose to change the manner of use for their transferred water rights from "irrigation" to "wildlife" use.[14]

The Nevada water code defines "wildlife purposes" to "include the watering of wildlife and the establishment and maintenance of wetlands, fisheries, and other wildlife habitats." Nev. Rev. Stat. § 533.023.[15]  On its face, this

---

[14] Though Nevada law is the source of substantive water law governing rights under the *Alpine* Decree, we need not consider, let alone defer to, the opinions of the Department and the State Engineer that the proposed use of water at Carson Lake and Pasture qualifies as irrigation. At bottom, this appeal requires us to determine the meaning of "irrigation" in Administrative Provision VII of the *Alpine* Decree, a question we review *de novo* according to the language, structure, and purpose of the Decree and the substantive state law provisions incorporated therein.

[15] That the Nevada legislature codified this definition nine years after entry of the *Alpine* Decree is of no moment. "It is settled that beneficial use expresses a dynamic concept, which is a variable according to conditions, and therefore over time." *Alpine I*, 697 F.2d at 855 (internal quotation marks and citations omitted).  Thus, we acknowledge developments in state law when defining and distinguishing between beneficial uses of water in the Newlands Project. It is also immaterial that

definition encompasses the Applicants' proposed use of water to maintain wildlife habitat at Carson Lake and Pasture. Moreover, the code distinguishes between "wildlife purposes" and other beneficial water uses such as agricultural irrigation. *See* Nev. Rev. Stat. §§ 533.135 (establishing $60 fee for proof of water right for livestock or wildlife purposes and $120 fee for proof of water rights for all other purposes), 533.0243(1) (declaring state policy of allowing the temporary transfer of agricultural water rights to wildlife and other instream uses). Thus, the Applicants' contention that their proposed use of water qualifies as both "wildlife" and "irrigation" lacks merit.

In an abstract sense, the Applicants' argument has technical support insofar as their proposed use of water at Carson Lake and Pasture, like the cultivation of alfalfa or livestock pasture, involves the mechanical application of water to grow plants. And the Applicants and State Engineer cite dictionaries, irrigation textbooks, and state agency publications that expansively define "irrigation" so as to encompass their proposed use. But in the context of the *Alpine* Decree and the Nevada water code, the argument plainly fails. Both the Decree and the state water code speak of irrigation solely in the context of agriculture and distinguish such use from the application of water for recreational, aesthetic, and wildlife purposes. There is simply no indication that either of the two relevant sources embraces the application of water to sustain wildlife habitat in its

the Nevada legislature declined to amend the statutory provision enumerating beneficial uses of water to explicitly include "wildlife purposes" as a distinct use. Because the *Morros* court determined that wildlife use is a component of recreation, which is statutorily defined as a beneficial use, such amendment was unnecessary.

definition of "irrigation." Therefore, we agree with the district court that the State Engineer's approval of the applications to transfer the non-consumptive use portion of the Applicants' water rights violated Administrative Provision VII of the *Alpine* Decree because the applications seek a change in the manner of use to a non-irrigation purpose. While we recognize the salutary purpose to which the Applicants wish to apply water at Carson Lake and Pasture, they may not do so in contravention of the express limitation on transfers of water rights articulated in the *Alpine* Decree.

## V

In sum, the district court correctly concluded that diversion of water for waterfowl habitat is not "irrigation" within the meaning of the *Alpine* decree. We affirm the judgment of the district court.

**AFFIRMED.**