UNITED STATES of America, Plaintiff,

v.

**ALPINE LAND & RESERVOIR COMPANY, a corporation, Defendant,**

**Pyramid Lake Paiute Tribe of Indians, Applicant–Appellant/Cross–Applicant–Appellee,**

**Truckee–Carson Irrigation District; Water Right Transfer Applicants, Applicants–Appellees/Cross–Applicants–Appellants.**

**Nos. 87–1746, 87–1747.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 15, 1988.

Decided July 7, 1989.

---

Robert S. Pelcyger, Fredericks & Pelcyger, Boulder, Colo., for defendant-appellant.

Frederick G. Girard, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, Cal., for defendant-appellee.

Fred R. Disheroon, Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before HALL, KOZINSKI and NOONAN, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

The Pyramid Lake Paiute Tribe of Indians (the Tribe) appeals the district court's decision to uphold the Nevada State Engineer's (the Engineer) approval of 129 applications for the transfer of water rights within the Newlands Reclamation Project in Nevada (the Project). The applications seek the transfer of water rights from Project properties that generally are not under irrigation to properties lacking water rights but which long have been irrigated with Project water. The Tribe's central contention on appeal is that the transferor properties have abandoned or forfeited their water rights under Nevada law. The district court held, however, that Nevada law was inapplicable to the validity of these transfer applications, and, alternatively, that the issues of forfeiture or abandonment were raised improperly before the Engineer.

We find that the Tribe is precluded in this appeal from challenging the forfeiture or abandonment of water rights for 104 of the subject applications because it failed to protest the transfers before the Engineer on this basis.[1] For the remaining twenty-five transfer applications, however, we reject the district court's holding that Nevada law is inapplicable and its conclusion that the issues of forfeiture or abandonment were raised improperly before the Engineer.[2]

## I

Pyramid Lake is the Tribe's aboriginal home. It is a desert lake, and the Truckee River is its only source of water. The Project is supplied with water from both the Truckee River and the Carson River, although only the Carson River flows directly into the Project. Water is diverted from the Truckee River at the Derby Dam, where it flows through the Truckee Canal to the Carson River for Project use.

The Supreme Court has acknowledged that Pyramid Lake is " 'widely considered the most beautiful desert lake in North America [and that its] fishery [has] brought it worldwide fame.' " *Nevada v. United States*, 463 U.S. 110, 114, 103 S.Ct. 2906, 2910, 77 L.Ed.2d 509 (1983) (quoting S. Wheeler, The Desert Lake 90–92 (1967)). The Court also noted that the first recorded sighting of Pyramid Lake by non-Indians occurred in January 1844 by Captain John C. Fremont. *Id.* (citing 1 The Expeditions of John Charles Fremont 604–605 (D. Jackson & M. Spence eds. 1970)). Upon discovering Pyramid Lake, Captain Fremont exclaimed that it "broke upon our eyes like the ocean" and was "set like a gem in the mountains." *Id.*

---

1. The district court concluded, however, that the Tribe's failure to protest the alleged forfeiture or abandonment of water rights did not preclude it from subsequently challenging these applications on this basis before the Water Master. Order at 12–14. Accordingly, this court's decision to affirm the validity of these 104 applications is without prejudice to the Tribe to challenge the transferor landowners' water rights under Nevada law.

2. Pursuant to the *Alpine* decree, the federal district court acts as an appellate court for decisions of the state Engineer. Needless to say, such jurisdiction is highly extraordinary. *See Pennzoil Co. v. Texaco, Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

We specifically approved of this jurisdictional arrangement in *United States v. Alpine Land &* *Reservation Co.,* 697 F.2d 851, 858 (9th Cir. 1983), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). The district court's jurisdiction is established as an adjunct to its jurisdiction over the quiet title action originally filed by the United States. We noted in our earlier decision affirming the *Alpine* decree that "[t]he district court maintains jurisdiction over this matter." *Alpine,* 697 F.2d at 860. The district court's equity jurisdiction was properly invoked to review the Engineer's decision in order to "provide full vindication of the admitted federal interests in the operation of federal reclamation projects." *Id.* at 858. In addition, 28 U.S.C. § 1345 vests district courts with original jurisdiction in all civil cases commenced by the United States. The United States originally commenced this action by petitioning the district court to review the decisions of the Engineer at issue on this appeal.

Two actions of the federal government have had a lasting historical impact on the lake. In 1859, the Department of the Interior set aside nearly half a million acres in Western Nevada as a reservation for the Tribe. In 1874, President Ulysses S. Grant confirmed the withdrawal of this acreage as the Pyramid Lake Indian Reservation. "The Reservation includes Pyramid Lake, the land surrounding it, the lower reaches of the Truckee River, and the bottom land alongside the lower Truckee." *Id.* at 115, 103 S.Ct. at 2910. Members of the Tribe have always lived on the lake's shores and fished its waters. *Pyramid Lake Paiute Tribe of Indians v. Morton,* 354 F.Supp. 252, 254 (D.D.C.1973).

Upon the passage of the Reclamation Act of 1902, the Secretary of the Interior (Secretary) withdrew 232,800 acres in western Nevada, which ultimately became the Project. The Project was designed to irrigate a substantial amount of this land with water from the Truckee and Carson Rivers, thereby turning wasteland into farmland.[3]

Unfortunately, Pyramid Lake has suffered environmental setbacks as a result of the Project's use of waters from the Truckee River. While the lake was 50 miles long and 12 miles wide when viewed by Captain Fremont, by 1983 the lake's surface area had decreased by about 31 square miles. *Nevada v. United States,* 463 U.S. at 115, 103 S.Ct. at 2910. This decrease in surface area drove the fish indigenous to the lake, the Lahontan cutthroat trout and the cui-ui sucker, to near extinction. The greatly decreased water acreage caused a delta to form near the mouth of the Truckee River that prevented the fish from reaching their spawning grounds in the river.[4]

## II

The parties to this litigation or their predecessors in interest have been before courts and other adjudicative bodies since 1913 in an attempt to settle the water rights dispute between the Tribe and the Project landowners. In that year, the United States initiated what became known as the *Orr Ditch*[5] litigation in an attempt to settle the competing claims to the waters of Truckee River. The *Orr Ditch* district court entered a final decree in 1944, but that litigation was not ultimately put to rest until the Supreme Court rejected a collateral attack by the United States in the *Nevada v. United States* case.

The United States initiated a separate litigation to adjudicate claims to the waters of the Carson River, which concluded with the entry of a final decree in 1980. *See United States v. Alpine Land & Reservation Co.,* 503 F.Supp. 877 (D.Nev.1980), *substantially aff'd,* 697 F.2d 851 (9th Cir.), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). The *Alpine* decree also established the scheme for transferring all water rights within the Project. The transfer applications in this case are the first ones to have been filed with the Engineer pursuant to the *Alpine* decree.

The *Alpine* and *Orr Ditch* decrees established the water duties that particular types of properties are entitled to receive. A water duty is the maximum amount of water that a property is entitled to receive from the Project, expressed in terms of acre feet per acre (afa). Properties classified as bench lands are entitled to receive 4.5 afa, while bottom land properties are entitled to 3.5 afa.[6]

The governing decrees resulting from these proceedings deal with the Project as a whole. While these previous proceedings

---

**3.** But no more than 65,000 acres of land in the Project have ever been irrigated. *Nevada v. United States,* 463 U.S. at 117 n. 3, 103 S.Ct. at 2912 n. 3.

**4.** *See Nevada v. United States,* 463 U.S. at 119 n. 7, 103 S.Ct. at 2913 n. 7. As noted by the Court, the operation of fish hatcheries and the construction of a fishway that bypasses the delta have enabled the fish to make a comeback from extinction.

**5.** *United States v. Orr Ditch Co.,* Equity No. A–3 (D.Nev.).

**6.** Bench lands require more water for irrigation because of their lower water table and drier soil. An acre foot is the amount of water required to cover an acre of land to a depth of one foot.

have settled many issues, they have not determined whether the particular Project properties involved in this case are entitled to receive Project water. The rights of particular properties to receive Project water are based on contracts and certificates issued by either the Secretary or the Truckee–Carson Irrigation District (TCID).[7]

Some Project properties are presently under irrigation although they are not entitled to receive Project water by contract or certificate. Indeed, most of the properties in this case to which appellees seek to transfer water rights are examples of these improperly irrigated properties. The Tribe contends that appellees' proposed transfers of water rights to these heretofore improperly irrigated properties violate various aspects of Nevada law. The result of nullifying these proposed transfers, according to the Tribe, is that the Project's net consumption of water from the Truckee River will decrease, thereby increasing the water flowing onwards to Pyramid Lake. Given this perspective, the transfer applications involved in this case are not merely footnotes to this ongoing water rights dispute; they raise significant legal issues not previously settled by the courts.

## III

The *Alpine* decree provides that "[a]pplications for changes in the place of diversion, place of use or manner of use as to Nevada shall be directed to the State Engineer." Pursuant to this arrangement, appellees filed three different groups of applications to change the place of use of water rights within the Project. The first group consisted of fifty-eight applications, the second of fourty-four, and the third of twenty-seven. A single application may seek to transfer water rights from several, or even a couple dozen, properties. In other words, an application may combine the water rights held by many small properties and transfer them to a single site.

The Tribe filed timely protests under the terms of the governing decrees and Nevada law.[8] Nev.Rev.Stat. § 533.365 provides that an interested party may file a protest to a proposed water rights transfer before the Engineer. The Tribe objected to the first two groups of transfers on a variety of grounds; namely, that the transfers threatened to conflict with and impair the Tribe's existing water rights, that they threatened to detrimentally affect the public interest, and that they would increase the net consumptive use of water by the Project.[9] The Tribe asserted that it has a "reserved right" to the waters of the Truckee River that are not subject to bona fide claims by Project landowners.

The Tribe protested the third group of applications on the same grounds, and in addition, twenty-five out of twenty-seven applications on a variety of additional grounds. For the first time, the Tribe alleged that the transferor landowners had failed to perfect, abandoned, or forfeited their water rights under Nevada law. Furthermore, the Tribe argued that the records maintained by TCID did not accurately reflect the true state of Project water rights. The Tribe also argued that the proposed transfers were invalid because it was not impracticable to use the water rights on the transferor properties, and because the transferee properties had been improperly using Project water in the past.

The Engineer found that none of the proposed transfers threatened to conflict

---

**7.** Many of these contracts date back to the early days of the Project, while others were issued in the 1940s and 1950s. Pursuant to these contracts and certificates, about 73,000 acres of Project properties are entitled to water, although only about 60,000 acres are presently under irrigation.

**8.** The Tribe also filed concededly untimely protests to a fourth group of 12 applications. The Engineer rejected these applications as untimely, and the district court affirmed. We agree that under Nevada law, the Engineer acted with-

in his discretion in rejecting these untimely protests.

**9.** The Tribe also argued that the Secretary's approval was necessary, and that the Secretary was precluded by various provisions and regulations from approving the transfers. The Tribe does not contend in this appeal that the Secretary's approval was necessary. We address the Secretary's role in a companion case. *See Pyramid Lake v. Hodel,* 878 F.2d 1215 (9th Cir.1989).

with the Tribe's water rights. The governing decrees established the maximum amount of water the Project can take from the Truckee and Carson rivers. The Engineer specifically found that there was no evidence that the Project's consumption of water would exceed the maximum permissible amount, and that the record provided "substantial and conclusive evidence that the changes will not detrimentally effect [sic] or impair [the Tribe's] existing water rights...."

The Engineer also concluded that there was no conclusive evidence that the transfers "will be detrimental to the public interest or welfare." The Engineer stated that he was "sympathetic" to the public interest in preserving the Lahontan cutthroat trout and the cui-ui sucker, but that as the transfers would not cause the Project to exceed established limits, the applications were valid.

With regard to the twenty-five applications in the third group, the Engineer concluded that the transferor landowners had not forfeited or abandoned their water rights under Nevada law. The Engineer held that Nevada's statutory provisions for forfeiture or abandonment, initially enacted in 1913, did not apply to the transferor properties, because they had vested previously in the United States in 1902. Applying the common law of abandonment, however, the Engineer concluded that "[m]ere non-use of the water to which an appropriator is entitled under valid water rights without substantial and conclusive evidence of *intent* to abandon and relinquish possession is not sufficient for a finding of abandonment." The Engineer also implied that this court's *Alpine* decision recognized and approved of the irrigation of non-water rights land.

The Tribe and the United States appealed the Engineer's rulings to the district court. The district court, however, did not address the Engineer's argument that Nevada's statutory forfeiture provisions were inapplicable because the United States acquired the water rights in 1902, nor did the court address the Engineer's conclusion that this court's *Alpine* decision recognized the in-

formal transfer of water rights to non-water rights land. Rather, the district court affirmed the Engineer's approval of the transfer applications on the alternative rationale that Nevada law did not apply.

The district court noted that from 1927 to 1969 the United States had delegated the operation of the Project to the TCID. During this time, various farmers used Project water, although they had no contract or certificate entitling them to do so. The district court labeled these uses "informal transfers," made with the apparent acquiescence of the TCID.

In our *Alpine* decision, we stated that "[w]e agree with the district judge that 'the conspicuous absence of transfer procedures, taken in conjunction with the clear general deference to state law, impels the conclusion that Congress intended transfers to be subject to state water law.' " *Alpine*, 697 F.2d at 858 (quoting *Alpine*, 503 F.Supp. 884). The district court stated that "[i]t was not until [this court's *Alpine* decision in] 1983 that it was definitively determined that transfers of places of use of water and the procedures to be followed were governed by the Nevada water law." Given this history, the district court concluded that it would be inequitable to apply this court's holding in *Alpine* that Nevada law governs water rights transfers within the Project "retroactively."

## IV

In judging the district court's holding, this court is cognizant that "a statute is not 'retroactive' simply because facts from the pre-enactment period are implicated.... Indeed, the presumption against 'retroactivity' has generally been applied only when application of the new law would affect rights or obligations existing prior to the change in law." *Campbell v. United States*, 809 F.2d 563, 571 (9th Cir.1987). We analyze this issue de novo. *Id.* at 567.

## A

The transfer applications all were filed *after* entry of the final *Alpine* decree. If these applications are to be exempt from

the strictures of Nevada law, then our *Alpine* decision would not be much more than sound and fury, because it would be inapplicable to all "informal transfers" taking place before 1983. The *Alpine* decision necessarily contemplated that state law would control both the process and the substance of a proposed transfer of water rights. "Fundamental principles of federalism require the national government to consult state processes and weigh state substantive law in shaping and defining a federal water policy." *Alpine*, 697 F.2d at 859.

**B**

This court's holding in *Alpine* that state law governs the validity of transfers of water rights was simply an application of the 1902 Reclamation Act. Section 8 of Act provides:

> "That nothing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder ... Provided, That the right to the use of water acquired under the provisions of this Act shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

The Supreme Court has acknowledged that "the Act clearly provided that state water law would control in the appropriation and later distribution of the water." *California v. United States,* 438 U.S. 645, 664, 98 S.Ct. 2985, 2995, 57 L.Ed.2d 1018 (1978).

Thus, it was the 1902 Act that established that Nevada state law was governing, not this court's approval of the *Alpine* decree in 1983. Section 8 of the Reclamation Act expressly disclaims any intention of displacing state water law except to insure that landowners receive a water duty consistent with beneficial use. If landowners disregarded this express congressional directive, they did so at their own risk.

Furthermore, the district court erred in asserting that it did no more than approve transfers that already had been informally transferred with the permission of the United States or the TCID. This begs the question. Neither of these parties has any power to transfer water rights, informally or otherwise, unless such transfers accord with Nevada law. In 1973, Judge Gerhard Gesell directed the government to insure that "land not entitled to water under the decrees and contract with the District [will be] prevented from taking the water." *Morton,* 354 F.Supp. at 257. This order provides solid evidence refuting the district court's assumption that the landowners were innocent in improperly irrigating their lands with Project water.

The district court below described Judge Gesell's 1973 order as having "frustrated" the government's effort to transfer rights to "non water right lands." While the district court may be entitled to disagree with Judge Gesell, the latter's 1973 ruling put the parties on notice long before 1983 that landowners irrigating "non water rights land" were doing so without judicial approval.

**C**

Finally, the district court's assessment that Nevada law does not apply retroactively to govern the alleged forfeiture or abandonment of water rights "informally transferred" before 1983 is hard to square with its original 1980 ruling affirming the *Alpine* Final Decree. There, the district court addressed the issue of whether the United States had "forfeited the claimed rights" in the late 1800's and early 1900's by failing to comply with Nevada law. *Alpine,* 503 F.Supp. 883–85.

The court first noted that Nevada enacted its statutory water rights scheme in 1913. In reviewing the United States' right to waters obtained prior to 1913, the district court held that these water rights were "governed by the Nevada case law existing before the enactment of the statutory scheme." *Id.* at 884. The court upheld the pre–1913 water rights only because it found "no requirement in the pre–

1913 common law for notices of, or applications for, changes in the place of diversion or place of use for water rights vested and transferred prior to 1913." *Id.*

The United States also had failed to make change applications for certain water rights obtained during the Project's initial establishment, but after 1913. The district court upheld the United States' right to these water rights, however, ruling that application of Nevada's statutory transfer scheme during this short period would frustrate Congress' intent in establishing the Project. Yet the district court was quick to emphasize that "now that the Project has been completed for many years, the government is subject to all the strictures of the state law...." *Id.* at 885.

For all these reasons, we find that the district court erred by failing to apply this court's ruling in *Alpine* that Nevada law governs the transfer of water rights under the Final Decree.

### V

▮ The district court conceded, however, that it is mandatory under Nevada law that the Engineer determine whether a proposed transfer of water rights threatens to prove detrimental to the public interest. We agree. Under Nevada Revised Statute § 533.370(3) the Engineer shall reject an application "[w]here there is no unappropriated water in the proposed source of supply, or where its proposed use or change conflicts with existing rights, or threatens to prove detrimental to the public interest." The *Alpine* Final Decree provides that the Engineer's rulings "shall be prima facie correct."

The Tribe renews on appeal its argument before the Engineer that the transfer applications threaten to prove detrimental to the public interest and conflict with the Tribe's existing water rights.[10] The Tribe's principal public interest argument is that the transfers would damage Pyramid Lake's threatened and endangered fish by further depleting the waters of the Truckee River flowing into the lake. The Tribe also ar-

gues that increased water flow into the lake would benefit its trophy trout fishery.

The Tribe's public interest argument cannot be regarded as anything short of an attempted collateral attack on the *Orr Ditch* decree. "[E]veryone involved in *Orr Ditch* contemplated a comprehensive adjudication of water rights intended to settle once and for all the question of how much of the Truckee River each of the litigants was entitled to." *Nevada v. United States*, 463 U.S. at 143, 103 S.Ct. at 2924. The Engineer found that the proposed transfers would not cause the Project to exceed the overall maximum water consumption provided for in the *Orr Ditch* and *Alpine* decrees, and the record supports this finding. Indeed, the Engineer found that these proposed transfers "cumulatively represent[] a reduction in diversion from the existing places of use which results in less demand on project water."

By establishing the maximum aggregate amount of water to which the Project was entitled, the *Orr Ditch* decree necessarily embodies an evaluation of the competing public interests in supplying Project farmers with sufficient water to grow their crops, and Pyramid Lake with sufficient water to benefit indigeneous fishes. Because the Tribe has asserted no threat to the public interest apart from those considered in the *Orr Ditch* decree's water rights allocation, the Engineer's conclusion that the transfers do not conflict with the Tribe's water rights satisfies *both* the public interest aspect and the conflicting rights aspect of section 533.370(3). Moreover, the Engineer's conclusion that the proposed transfers did not threaten to harm the lake's fishes is supported by substantial evidence.

### VI

▮ While the district court concluded that the Engineer properly was presented with the issues of the public interest and conflicting rights, the court also concluded that the issues of perfection, abandonment,

---

**10.** To the extent that the Engineer used the wrong standard in evaluating the threat to the

public interest, we agree with the district court that it was harmless.

and forfeiture were raised improperly before the Engineer. Citing the *Alpine* Final Decree, the district court stated that such disputes must be raised before the federal Water Master. The Water Master is a special master appointed by the district court. The Final Decree provides that "[a]ll disputes on the Carson River system involving the existence or ownership of water rights ... shall first be submitted to the Water Master for determination as a jurisdictional prerequisite to any complaint to the Court for relief."

### A

It is not at all clear from this provision, however, that it was inappropriate for the Engineer to adjudicate the Tribe's claims of forfeiture and abandonment. While the Final Decree provides that ownership disputes must be raised before the Water Master prior to proceeding to the district court, it does not address whether it might be appropriate first to proceed before the Engineer. The Final Decree does, however, provide that all applications for changes in the place of use of water rights are within the Engineer's original jurisdiction.

The district court in *Alpine* referred transfer applications to the Engineer in light of Nevada's existing comprehensive regulatory scheme. This court affirmed the district court's finding that the Engineer should have first crack at a change application because "Congress intended transfers to be subject to state water law." 697 F.2d at 858. We also stated that "[f]undamental principles of federalism" dictated deference to state law. *Id.* Given this court's acceptance in *Alpine* of the Engineer as the party with original jurisdiction over applications to transfer water rights, it hardly violated the Final Decree for the Engineer to consider the Tribe's objection that the applications should be rejected due to alleged forfeiture or abandonment.

### B

■ The Tribe further argues that the Engineer's rulings must be reversed because he did not make certain findings required by Nevada law.[11] Principally, the

11. The Tribe also argues that in assessing the transfer applications, the Engineer relied upon a defective study, prepared by the TCID, which describes the Project properties properly classified as either bench lands or bottom lands. The district court subsequently has concluded that 2,358.80 acres previously classified as bench lands should be downgraded to bottom lands. *See U.S.A. v. Alpine, etc.,* No. D-185 BRT, Order of February 12, 1988, at 11. The court further held that future disputes concerning appropriate classification should be directed to the Water Master on an individual basis.

The Tribe now contends that the Engineer's failure to wait until the bench/bottom dispute was resolved infected his transfer rulings because the ability of transferor water rights to satisfy the needs of transferee properties depends upon the water duty appropriate to both properties. The Tribe states that "[i]n some instances, additional water rights will have to be transferred in order to make up for the deficiency."

The Tribe's contention that the Engineer based his decision upon a defective record in light of the proceedings now ongoing before the Water Master is simply an inevitable consequence of the fact that an administrative record must close at some fixed point in time. Were we to remand a case every time the facts and circumstances changed following the adminis-

trative ruling, appellate review could be delayed indefinitely. Our general practice is, therefore, not to remand unless extraordinary circumstances justify our doing so. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 294–96, 95 S.Ct. 438, 446–47, 42 L.Ed.2d 447 (1974).

Such circumstances are not present here. The Tribe concedes that the Engineer approved the transfer applications with the understanding that the classifications were in dispute, and with full knowledge that some project properties might be reclassified in the future. Little has changed in this regard; the classifications of some of the disputed properties are still unresolved, and are likely to remain so for some time. Remand to the Engineer at this point would cause substantial delay and serve little purpose.

The Tribe's principal concern is that the TCID mistakenly classified thousands of acres of bottom land as bench land. If a transferor property originally was credited as bench land but now is designated as bottom land, then the transferee property would have received a greater amount of water than it would have had the revised classification been used in the first place. In other words, the aggregate water transferred to the transferor properties would be excessive and additional water rights would

Tribe cites the issues of perfection, forfeiture, abandonment, the impracticability of using water on the transferor properties, and the previous irrigation of certain transferee properties. "The State Engineer did not address or resolve any of these issues in any of the three Rulings under review. His Rulings therefore must be reversed and remanded."

The Tribe's argument is hard to understand. The Tribe did not protest the first two groups of applications on these grounds. Concerning the third group of applications, the Engineer explicitly addressed and rejected the Tribe's contention that the transferor properties had forfeited or abandoned their water rights. While the Engineer did not expressly resolve the impracticability issue, the district court found that he had implicitly concluded that it was impracticable to irrigate the transferor properties.

The Tribe's confusion is somewhat easier to understand given the district court's holding that it was inappropriate under the *Alpine* Final Decree for the Engineer to consider these issues in the course of a transfer application proceeding. The Tribe's rebuttal to the district court's holding is that it was *mandatory* for the Engineer to address these issues. The Tribe contends that the Engineer cannot grant a change application under section 533.325 unless the applicant in fact already has appropriated the water right he seeks transferred.

"The law of Nevada, in common with most other Western States, requires for the perfection of a water right for agricultural purposes that the water must be beneficially used by actual application on the land." *Nevada v. United States,* 463 U.S. at 126, 103 S.Ct. at 2916 (citing *Prosole v. Steamboat Canal Co.,* 37 Nev. 154, 159–61, 140 P. 720, 722 (1914)). Section

533.325 permits any person to apply to the Engineer "to change . . . the place of water *already appropriated.* . . ." (emphasis added).

The Tribe further notes that its contention that section 533.325 only authorizes a transfer of water rights that have been put to beneficial use is in accord with the approach adopted by the supreme courts of Wyoming, Idaho, and Colorado. In *Basin Electric Cooperative v. State Board of Control,* 578 P.2d 557, 563–64 (Wyo.1978), for example, the court rejected a transfer of water rights that had not been put to beneficial use because "an appropriator obtains a transferable water right only to the extent that he has put his appropriation to a beneficial use." *See also Jenkins v. State,* 103 Idaho 384, 647 P.2d 1256 (1982) (State Department of Water Resources had jurisdiction to consider issues of abandonment and forfeiture in transfer proceedings); *Rocky Mountain Power Co. v. White River Electric Ass'n,* 151 Colo. 45, 376 P.2d 158 (Colo.1962) ("If in fact the original decreed water rights have been abandoned the water originally decreed belongs to the stream. . . ."); *Green River Development Co. v. FMC Corp.,* 660 P.2d 339, 351 (Wyo.1983) (state engineer has no "right to transfer permit water which admittedly has neer been utilized beneficially").

### C

Section 533.365 provides that "[a]ny person interested may . . . file with the state engineer a written protest against the granting of the application, setting forth with reasonable certainty the grounds of such protest. . . ." Nevada case law, however, does not indicate what sorts of objections the Engineer must consider in ruling

---

have to be transferred in order to make up the deficiency.

The Tribe's understandable frustration with the possibility that some transferee properties may have received more water than strictly justified by the water rights due the transferor properties is easily cured. If a transferor property has been subsequently downgraded to bottom land from bench land, then the Tribe should be permitted to apply to the Water Master for an appropriate reduction in the water supplied to the transferee property. But the mere speculative possibility that any of the transferor properties involved in this case may be reclassified at some future date does not merit a remand to the Engineer.

on a transfer application. Section 533.-370(3) establishes a limited set of circumstances that preclude the Engineer from granting an application.[12] But section 533.-370(3) does not preclude the Engineer from granting a transfer application where the transferor property is alleged to have forfeited its water right, *see* section 533.070, or where it is not impracticable to use water beneficially in its present site, *see* section 533.040.

■ In another context, this court has described the Engineer as essentially performing a largely ministerial duty in approving a transfer application. *See Salmon River Canal Co., Ltd. v. Bell Brand Ranches,* 564 F.2d 1244 (9th Cir.1977), *cert. denied,* 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 758 (1978).[13] In any event, this case does not require us to determine the Engineer's obligations under Nevada law

to consider issues such as alleged forfeiture or abandonment in a transfer application proceeding. The Tribe did not even raise these issues before the Engineer in the first two groups of applications. In the third group, the Engineer addressed the Tribe's arguments and rejected them.[14]

While it may not be incumbent upon the Engineer to adjudicate such issues as perfection or forfeiture in a transfer proceeding, it is perfectly valid for him to do so under both Nevada law and the Final Decree. *See* N.R.S. §§ 533.090 & 533.060; *Application of Filippini,* 66 Nev. 17, 202 P.2d 535 (1949). Given the Engineer's specific findings on abandonment in the proceedings below, the district court erred by not addressing the merits of the Engineer's ruling that Nevada's statutory forfeiture provisions were inapplicable, and that there was no evidence of transferor landowners'

12. *See supra,* section V.

13. In *Salmon River,* a Nevada ranch owner brought a diversity action seeking to prevent other ranch owners from pumping water from wells on neighboring land. The Nevada State Engineer previously had approved the applications of the neighboring landowners to pump water from the disputed wells and to irrigate their farmlands. The district court dismissed the plaintiff's lawsuit on the basis that the Engineer's prior approval of the defendants' applications prevented the plaintiff's alleged collateral attack on the propriety of the pumping.

The *Salmon River* court rejected the proposition that the plaintiff was estopped from contesting the validity of the pumping. The court stated: "Turning first to the permit application provisions (N.R.S. § 533.325, et seq.), we believe that the approval of an application for an appropriate permit, although involving some discretion under statutory criteria, is largely ministerial." 564 F.2d at 1247. Accordingly, the court held that "the permit application proceeding was not considered to be an adjudication of the relative water rights but rather only for the administrative use of the State Engineer to aid in his supervision of the state's waters." *Id.*

The *Salmon River* court emphasized the Engineer's obligation under section 533.370.1 to approve an application unless it "tend[ed] to impair the value of existing rights." *Id.* The court reasoned that as the Engineer's approval of an application only adjudicated the proposed water use's tendency not to impair existing rights, "[t]he determination of whether or not there is an actual conflict in existing rights is left open to future determination of relative rights...." *Id.*

Section 533.370 has been amended, however, and no longer premises the Engineer's duty to deny an application on its mere tendency to impair existing rights. Rather, the Engineer shall reject an application "[w]here there is no unappropriated water in the proposed source of supply, or where its proposed use or change conflicts with existing rights, or threatens to prove detrimental to the public interest." *See* N.R.S. 533.370(3) (1987). However, as indicated in the text, this court need not determine whether or not the Engineer's ruling on conflicting uses in a transfer proceeding still is largely ministerial.

14. The district court concluded that the Engineer had made an implied finding that irrigation was impracticable on the transferor properties. Section 533.040.1 provides "[t]hat if for any reason it should at any time become impracticable to use water beneficially or economically at the place to which it is appurtenant, the right may be severed from such place of use...." The Tribe argues that this section precludes the Engineer from granting a transfer application unless it is well-nigh impossible to irrigate the transferor property economically. Nevada case law does not support this restrictive reading of section 533.040.1, nor does the statute itself indicate that the Engineer can approve an application only if present use is impossible.

Finally, the Tribe argues that the transfers are invalid because appellees have irrigated their properties without contractual authorization. The Tribe, however, fails to cite any aspect of Nevada law that precludes the Engineer from approving a transfer on this basis.

intent to abandon their water rights.[15]

## VII

■ The district court did not consider the merits of the Engineer's conclusion in his third order that the transferor landowners had not abandoned their water rights. The Engineer held that this court's *Alpine* decision recognized the informal transfer of water rights to non-water rights properties, and that Nevada's statutory forfeiture provisions do not govern because title had vested previously in the United States.

### A

This court's decision in *Alpine* in no way approved the so-called "informal transfer" of water rights. In *Alpine*, the United States sought to use the Reclamation Act's incorporation of state law to demonstrate that the district court had awarded an excessive water duty of 3.5 afa to bottom land and 4.5 afa to bench land. *Alpine*, 697 F.2d at 853. The United States identified a 1903 Nevada statute and various contracts with Project farmers that limited the water duty to a maximum of 3 afa. The United States argued that these controlled the appropriate water duty.

The court rejected the government's position: "it is clear the district court did not err in giving the contracts and the Nevada statute relied on by the United States little evidentiary significance." *Alpine*, 697 F.2d at 856. The *Alpine* court stated that "historically, no distinction was made between landowners with and without limiting contracts." *Id.* at 856. The Engineer evidently interpreted this statement to mean that this court has accepted the *de facto* transfer of water rights to Project properties lacking water rights: "The fact that individual project farmers were not using water on the *exact* acreage for which they contracted on an acre-for-acre accounting was addressed and disposed of in *Alpine.*"

The Engineer clearly has read too much into our *Alpine* decision. We found that historically, water was supplied to Project farmers with contracts entitling them to receive Project water irrespective of the afa limit established in particular contracts. "Indeed, it appears that one landowner would sign a contract containing a 3 afa limit, while others, identically situated, *signed contracts* promising all the water needed for 'proper irrigation.'" *Id.* at 856 (emphasis added). Thus, our analysis in *Alpine* was premised on the contractual rights of the farmers to receive Project water in some amount, rights appellees simply do not have.

### B

Furthermore, the *Alpine* court rejected the Nevada statand the contracts only because it found federal law preemptive. The *Alpine* court seized on the Reclamation Act's express caveat in section 8 that "beneficial use" is the measure of the water right. The court held that if the 1903 "Nevada statute provided a measure other than beneficial use, the limit would be ineffective in view of the binding 'congressional directive' that 'the water right must be ... governed by beneficial use.'" *Alpine*, 697 F.2d at 855 (quoting *California v. United States*, 438 U.S. at 668 n. 21, 98 S.Ct. at 2997 n. 21).

The *Alpine* court's discussion of the beneficial use requirement occurs only in the context of determining how much water

---

15. The Final Decree mandates that the Engineer has original jurisdiction over applications for the transfer of water rights. It also provides that an aggrieved party can appeal the Engineer's rulings to the district court. Finally, it states that disputes over the existence or ownership of water rights shall be submitted to the Water Master as a jurisdictional prerequisite to "any complaint to the Court for relief."

There is some tension in the Final Decree's procedural scheme, however, where, as here, the Engineer's rulings in the course of a transfer application implicate the existence or ownership of water rights: Appeals from the Engineer's rulings must be filed with the district court, but disputes over the existence of water rights must be filed with the Water Master as a jurisdictional prerequisite to any complaint to the district court. Accordingly, following remand, the district court is free either to refer this matter to the Water Master, or to rule on it in the first instance.

duty is appropriate for lands *already* entitled to receive Project water. Section 8 of the Act strictly limits the beneficial use concept to properties that are entitled to receive Project water. Section 8 explains that beneficial use is the measure of the "right to the use of water *acquired under the provisions of this Act*" *Id.* (emphasis added).

The critical defect with the transferee properties involved in this case, however, is that they generally have no right to receive Project water. The landowners do not hold contracts or certificates entitling their properties to be irrigated. The beneficial use discussion, central to the *Alpine* decision, is therefore of no consequence to the presumed right of transferee properties to receive transferred water rights.

Under the Act, state law governs the "control, appropriation, use, or distribution" of Project water, except that state law cannot prevent Project properties entitled to receive water from receiving less than a water duty maximizing the property's contemporary beneficial use. Of course "beneficial use was itself intended to be governed by state law." *Alpine,* 697 F.2d at 854. Congress understood that state law concepts of beneficial use would permit a landowner to forfeit his water right. We noted in *Alpine:*

> The settlor or landowner who complies with all the conditions of the act secures a perpetual right to the use of a sufficient amount of water to irrigate his land, *but this right lapses if he fails to put the water to beneficial use ....*

*Id.* at 854 (quoting remarks of Rep. Mondell, 35 Cong.Rec. 6677 (1902)) (emphasis added).

## VIII

The district court's error was to conclude that Nevada law is wholly irrelevant, and that it is inappropriate for the Engineer to adjudicate the issues of perfection, forfeiture, or abandonment. Upon remand, the district court must evaluate the merits of the Engineer's ruling that Nevada's statutory forfeiture provisions do not apply and his finding that under Nevada's common law of abandonment the transferor landowners have not indicated an intent to abandon their water rights.[16]

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED**

NOONAN, Circuit Judge, concurring:

Only one issue was presented on this appeal as to equitable principles under Nevada law, *viz.,* whether the *Alpine* decree could be applied retroactively. Traditional equitable principles govern whether the strict requirements of Nevada water law are to be relaxed with regard to a present application. *Bailey v. State,* 95 Nev. 378, 594 P.2d 734, 736–39 (1979); *State Engineer v. American National Insurance Co.,* 88 Nev. 424, 498 P.2d 1329 (1972). In this case, on remand, it may be that a determination must be made whether each individual transfer application can be upheld in equity. With this caveat I concur.

16. Appellees have filed a cross-appeal: They claim that the district court erred in ordering a reduction in the acreage of bench land irrigable at 4.5 afa with water transferred from bottom land (which received 3.5 afa), to compensate for the increase in appropriated water. They contend that the Engineer already had compensated for the increase by permitting only the transfer of 3.5 afa, not the full 4.5, from bottom land to bench land. As a result, they argue, the total amount of water has been compensatorily decreased twice.

Appellees' argument rests on a gross misreading of the district court's order. The district court ordered a reduction in acreage, but simultaneously ordered that the full 4.5 afa should be available for transferee bench land, because it feared that an allocation of only 3.5 afa to bench land would conflict with the *Orr Ditch* and *Alpine* decrees. The district court thus compensated for any increases in water appropriated while undoing the compensation devised by the Engineer; the transfer applicants' argument that they are the victims of double compensation is frivolous. Accordingly, we reject appellees' cross-appeal and affirm the district court's order in this regard.