**UNITED STATES of America; Nevada State Engineer, Plaintiffs–Appellees,**

**County of Churchill, Petitioner–Appellant,**

**and**

**City of Fallon, Petitioner,**

v.

**ALPINE LAND & RESERVOIR COMPANY, Defendant,**

**and**

**Hugh Ricci, Respondent–Appellee.**

---

United States of America;  Nevada State Engineer, Plaintiffs–Appellees,

City of Fallon, Petitioner–Appellant,

and

County of Churchill, Petitioner,

v.

Alpine Land & Reservoir Company, Defendant,

and

Hugh Ricci, Respondent–Appellee.

Nos. 01–16694, 01–16789.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 7, 2002.

Filed Sept. 4, 2003.

Richard G. Campbell, Jr., Reno, NV, for appellant Churchill County.

Steven King, Fallon, NV, for appellant City of Fallon.

Susan Pacholski, Andrew Mergen & Stephen MacFarlane, DOJ, Washington, DC, Thomas Sansonetti, Assistant Attorney General, and Karen Koch, Sacramento, CA, for appellee United States.

Michael L. Wolz, Deputy Attorney General and Frankie Sue Del Papa, Attorney General, Carson City, NV, for appellee Nevada State Engineer.

Before SNEED, McKEOWN and PAEZ, Circuit Judges.

PAEZ, Circuit Judge:

Churchill County (the "County") and the City of Fallon (the "City") appeal the district court's judgment that affirmed the Nevada State Engineer's (the "State Engineer" or "Engineer") Ruling 4979. In that ruling, the State Engineer approved eight applications of the United States Fish and Wildlife Service ("USFWS") to transfer the place of use of certain water rights to supply needed water to the wetlands in the Stillwater National Wildlife Refuge ("Stillwater") in western Nevada. The State Engineer, rejecting the protests filed by the City and the County, determined that the changes in places of use would not conflict with existing water rights or threaten the public interest.

On appeal to the district court, the County and the City argued that the State Engineer's findings were not supported by substantial evidence and that the State Engineer should have ordered a study of the cumulative and potentially negative effects that future water rights transfers contemplated by USFWS might have on existing water rights and the public interest. In the alternative, the County argued that the State Engineer should have stayed ruling on the merits of the applications until the completion of related federal court litigation. The district court rejected all of the County's and the City's arguments and upheld the State Engineer's ruling in its entirety.

We have jurisdiction under 28 U.S.C. § 1291, and we affirm. Although we need not recount the extensive historical background of the present dispute, we briefly highlight the major events leading up to the dispute, including the enactment of the federal Reclamation Act in 1902, the development of the Lahontan Valley Wetlands in Churchill County, and the enactment of the Fallon Paiute Shoshone Indian Tribes

Water Rights Settlement Act (the "Settlement Act"), to provide context for the parties' arguments. Next, we address each of the arguments advanced by the County and the City and explain why the district court properly affirmed the State Engineer's ruling.

Although Congress enacted the Settlement Act in an effort to resolve many of the conflicts over water rights in the Newlands Reclamation Project, the extensive and ongoing litigation over these rights clearly indicates that many individual competing concerns have yet to be satisfied. Ultimately, although we cannot provide any final resolution to the continuing controversies over the allocation of water rights in the Newlands Reclamation Project, we hold that the State Engineer has broad discretion under Nevada law to determine whether a change in place of use of existing water rights will have a detrimental impact on the public interest or whether a hydrological or other study is necessary before approving such a transfer.

## BACKGROUND

### A. Historical Development

#### 1. The Reclamation Act

The Reclamation Act, Pub.L. No. 57–161, 32 Stat. 388 (1902), "directed the Secretary of the Interior to withdraw from public entry arid lands in specified Western States, reclaim the lands through irrigation projects, and then to restore the lands to entry pursuant to the homestead laws and certain conditions imposed by the Act itself." *Nevada v. United States,* 463 U.S. 110, 115, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). On the basis of this authority, the Secretary then "withdrew from the public domain approximately 200,000 acres in western Nevada, which ultimately became the Newlands Reclamation Project [the 'Project']. The Project was designed to irrigate a substantial area in the vicinity

of Fallon, Nevada, with waters from both the Truckee and the Carson Rivers." *Id.* The Project constructed facilities to divert and store Truckee and Carson River water together behind the Lahontan Dam, serving users in and around the City. *See id.* at 115–16, 103 S.Ct. 2906. Thereafter, the Truckee–Carson Irrigation District, acting on behalf of the United States, issued water rights contracts to individual landowners and settlers in the Project. *See id.* at 123–26, 126 n. 9, 103 S.Ct. 2906.

Competing and increasing demands for water from the Project generated substantial controversy over who possessed the water rights involved and how those rights could be exercised. Years of litigation ensued. We, as well as the Supreme Court, have detailed the numerous litigation disputes over rights to the water that was diverted from the Truckee and Carson Rivers to support the Project, and we need not restate that litigation history here. *See Churchill County v. Norton,* 276 F.3d 1060, 1065–67 (9th Cir.2001), *amended on denial of reh'g,* 282 F.3d 1055 (9th Cir. 2002); *Nevada,* 463 U.S. at 113–21, 103 S.Ct. 2906.

### 2. The Lahontan Valley Wetlands and the Settlement Act

As demands on the Truckee and Carson Rivers to support the Project increased, the maintenance of the Lahontan Valley wetlands [1] (the "wetlands") became a

source of concern. The Lahontan Valley is a basin at the end of the Carson River in Churchill County, and the wetlands were created where the River discharges into that Valley. The wetlands always have changed naturally in size depending upon the inflow of water from the Carson River—shrinking down to shallow marsh habitats in the hot summer months—but, for at least 4,000 years, the wetlands have been able to support a wide diversity of wildlife. *See Churchill County,* 276 F.3d at 1067–68. The Project, however, altered the natural hydrological flow in the wetlands, as flooding that had previously sent springtime flows down the Carson River into the marshes was contained and diverted into Project irrigation canals for delivery to newly created farmlands in the Carson Division of the Project. Thus, as water upstream from the wetlands was diverted for agricultural purposes, the Lahontan Valley wetlands and marshes largely dried up. *See id.* at 1068.

In 1990, in an effort to address the environmental and other concerns associated with the increasing demands on the Carson and Truckee Rivers, Congress passed the Settlement Act, which included provisions regarding the endangered wetlands in Title II.[2] Pub.L. No. 101–618, § 206(a), 104 Stat. 3289.[3] Sub-section 206(a) establishes the water rights acquisition and transfer program involved in this case. Section 206(a) directs the Secretary

---

**1.** The "Lahontan Valley wetlands" refers to "wetland areas associated with the Stillwater National Wildlife Refuge, Stillwater Wildlife Management Area, Carson Lake and Pasture, and the Fallon Indian Reservation." Settlement Act § 203(e).

**2.** Title I—the Fallon Paiute Shoshone Indian Tribes Water Rights Settlement Act of 1990—addresses the consolidation of the Tribes' Reservation holdings and is not at issue here. *See Churchill County,* 276 F.3d at 1064 n. 2.

**3.** Title II of Public Law 101–618—the Truckee–Carson–Pyramid Lake Water Rights Settlement Act—attempts to address many different facets of the reallocation of water between the Truckee and Carson Rivers, including "interstate water apportionment, management of Federal water storage and diversion facilities, protection and restoration of wetlands and endangered and threatened fish species, and the settlement of Indian tribal claims to water and other interests." S.Rep. No. 101–555, at 8 (1990). Specifically, section 205 authorized the Secretary of the Interior to negotiate with

of the Interior to "acquire and manage sufficient water and water rights to support 25,000 acres of wetland[ ]" habitat within the Lahontan Valley wetlands. *Churchill County*, 276 F.3d at 1070. Title II further requires that all water rights selected for the program be transferred in accordance with applicable court decrees and State law, and used to apply water directly to the wetlands. Settlement Act § 206(a)(1)(c).[4]

## B. USFWS' Transfer Applications

As part of the water acquisition and transfer program mandated under section 206(a) of the Settlement Act, the USFWS began purchasing water rights from willing sellers in the Carson Division of the Project. After purchasing the water rights at issue here, the USFWS filed eight applications with the State Engineer

to change the place of use of these rights from their current places of use to the Stillwater National Wildlife Refuge ("Stillwater") in order to service the wetlands.[5] The entire acquisition program is expected to take approximately twenty years to complete, and the eight transfer applications at issue here involve the first 2,855 acre-feet of the approximately 75,000 acre-feet of water rights that the USFWS estimates it will ultimately need to acquire in order to comply with the Settlement Act.

The City's interest in these applications stems from the fact that it "operates its own municipal water system and provides domestic, commercial, and industrial water service to its residents." *Churchill County*, 276 F.3d at 1073. The water system is supplied by "wells whose aquifers are recharged through surface irrigation." *Id.*[6] As the City emphasizes, the present irriga-

California and Nevada to reach an Operating Agreement regarding the operation of the Truckee River reservoirs," to culminate in the Truckee River Operating Agreement ("TROA"). *Churchill County*, 276 F.3d at 1070. The proposed modifications to the TROA changed the operation of the Truckee River upstream water storage to provide for growth in the Truckee Meadows and to ensure that there will be sufficient water flows in the lower Truckee River for cui-ui fish spawning in the spring. Section 207 seeks to increase flows in the Truckee River below Derby Dam to help sustain certain species of fish in the river and in Pyramid Lake. Section 209 contemplates revisions to the Operating Criteria and Procedures for the Newlands Project, authorizing the Secretary of the Interior to study the feasibility of improving the conveyance efficiency of Newlands Project facilities. The County and the City argue that collectively, these provisions will undoubtedly result in reduced flows through the Truckee Canal to the Newlands Project which will in turn reduce recharge to the aquifers underlying Project lands in the County and the City. The provision involved in this appeal, section 206(a), however, deals only with the protection and restoration of the Lahontan Valley wetlands.

4. Applications to change the purpose or place of use of a water right must first be filed with the State Engineer. *See United States v. Orr Water Ditch Co.*, 914 F.2d 1302, 1309 (9th Cir.1990). Established under Nevada Revised Statutes ("N.R.S.") section 532.010 *et seq.*, the State Engineer has authority under Nevada law for administering water rights. *See* N.R.S. § 532.165. A party adversely affected by the State Engineer's ruling that involves water rights within the Project may then seek judicial review in the United States District Court for the District of Nevada. *See Orr Water Ditch Co.*, 914 F.2d at 1308–09.

5. As noted, the Lahontan Valley wetlands include the Stillwater National Wildlife Refuge.

6. An aquifer is a "discrete hydrogeologic unit" and is defined as "a formation or part of a formation that contains sufficient saturated permeable material to yield significant quantities of water to wells and springs." Douglas K. Maurer et al., U.S. Geological Survey Open–File Report 93–463, *Hydrogeology and Potential Effects of Changes in Water Use, Carson Desert Agricultural Area, Churchill County, Nevada* 32 (1994) (internal quotation marks and citation omitted). The basalt aquifer, the main source of water for municipal wells in the City, is "a mushroom-shaped

**1178**

tion practices recharge the groundwater aquifers that are the source of drinking water supplies for the City's residents.[7] Although the County does not operate its own water system, *see id.*, it too is concerned with the potential effects that USFWS' transfers will have on its residents who rely on wells that tap shallow and intermediate aquifers.

Not surprisingly, the County's and the City's interests are not limited to the eight applications at issue here. The County and the City are concerned about *all* the acquisitions and transfers authorized by section 206(a) of the Settlement Act, as they maintain that these transfers will cause a reduction in the water tables and will prove detrimental to the quality and quantity of the aquifers supplying residents with domestic water. They contend that the acquisition of water rights and

delivery of water directly to the wetland areas, rather than its diversion through the present irrigation canal systems, will reduce recharge to the shallow groundwater in the City and cause domestic wells to dry up. *Water–Resources Investigations Report 93–4118* at Abstract 1.

## C. Course of these Proceedings

The transfer applications at issue here—applications 62314, 62315, 62492, 63464, 63546, 63652, 63802, and 63883—were filed by USFWS with the State Engineer on various dates between July 23, 1996 and March 2, 1998. USFWS sought to transfer the place of use of the water rights detailed in each application at a rate of 2.99 acre-feet per acre and sought to reserve the right to transfer at a later date an additional 0.51 acre-feet per acre of water rights that it had purchased.[8]

body of basalt near Fallon" through which water passes and is recharged by the chemical properties of the sediment. *Id.* at 33. A shallow aquifer, an intermediate aquifer, and a deep aquifer also lie in the Fallon area, all resting at various depth levels below land surface and creating a similarly-tiered system of groundwater flow systems in the area. *See id.* at 32–33.

7. The principal source of recharge to the aquifer systems in the southern Carson Desert is "infiltration from the system of river channels, canals, and ditches that crisscross the desert. Other sources include infiltration of irrigation water, local ponding of precipitation in low-lying areas after intense storms ... and precipitation in mountains surrounding the basin." Michael S. Lico & Ralph L. Seiler, U.S. Geological Survey Open–File Report 94–31, *Ground–Water Quality and Geochemistry, Carson Desert, Western Nevada* 14 (1994) (*"Open–File Report 94–31 "*) (internal citations omitted). Historically, the shallow groundwater discharged into deep open drains and was carried to the wetlands. Ralph L. Seiler & Kip K. Allander, U.S. Geological Survey Water–Resources Investigations Report 93–4118, *Water–Level Changes and Directions of Ground–Water Flow in the Shallow Aquifer, Fallon Area, Churchill Coun-*

*ty, Nevada* 2 (1993) (*"Water–Resources Investigations Report 93–4118 "*). This shallow groundwater was of poor quality and carried trace elements of arsenic and selenium to the wetlands, resulting in habitat degradation. However, domestic wells tapping this shallow groundwater provide potable water for rural residents. These conflicting interests have made the quality and quantity of water in the shallow aquifer highly contested issues in Nevada. *Id.*

8. Application 62314 sought to transfer 9.63 acre-feet of water annually from its current location under Nuvian Way—a paved roadway approximately three to four miles south of Fallon—to Stillwater. Application 62315 sought to transfer 203.11 acre-feet of water annually from its current place of use approximately one-quarter mile west of Stillwater to Stillwater. Application 62492 sought to transfer 152.79 acre-feet of water annually from its current location just east of the Fallon Indian Reservation to Stillwater. Application 63464 sought to transfer 214.56 acre-feet of water annually from its current location approximately one mile west of Stillwater to Stillwater. Application 63546 sought to transfer 596.51 acre-feet of water annually from its current location adjacent to Stillwater to Stillwater. Application 63652 sought to

Among the many protest claims[9] that the County and City filed against the USFWS' transfer applications were claims that the transfers would unreasonably interfere with the County and City's existing water rights, would be detrimental to the public interest in violation of N.R.S. section 533.370(3),[10] and would violate the National Environmental Policy Act ("NEPA") because USFWS failed to prepare a programmatic environmental impact statement ("EIS") to analyze the cumulative impacts of the water rights acquisition and transfer program authorized by section 206(a) of the Settlement Act.[11] The County and the City argued that such an EIS was necessary to understanding the nature of the relationship between surface irrigation and ground-water recharge in the affected area. Prior to the hearing on USFWS' applications, the County and City filed a joint request for a continuance, requesting that the State Engineer direct the USFWS to prepare an environmental or hydrological study of its compliance with NEPA before the State Engineer considered the merits of the applications. In the alterna-

tive, the County and the City asked the State Engineer to exercise his authority under N.R.S. section 533.370(2)(b) and withhold action on the applications pending the outcome of federal court litigation brought by the County and the City challenging the adequacy of the WEIS.

The State Engineer denied their request for a continuance, and held an evidentiary hearing on the merits of the transfer applications. Subsequently, the Engineer issued Ruling 4979, finding that none of the various grounds for protest were meritorious. First, he found that none of the proposed transfers would conflict with existing water rights nor would they be detrimental to the public interest. The State Engineer also determined that the changes in places of use would not affect the community tax base, air quality, water quantity and quality, or the health and safety of the community. The Engineer further concluded that he lacked jurisdiction to determine whether USFWS had complied with NEPA in (1) its study (the WEIS) of the potential impacts of the water rights acquisition and transfer program and (2)

transfer 1,420.34 acre-feet of water annually from its current place of use on land within the boundaries of Stillwater to Stillwater in general. Application 63802 sought to transfer 36.72 acre-feet of water annually from its current location within the City limits (and on which a housing development now stands) to Stillwater. Application 63883 sought to transfer 221.56 acre-feet of water annually from its current location, approximately one mile east of the Fallon Indian Reservation and one mile west of Stillwater, to the Fallon Indian Reservation.

9. The City filed timely protests to applications 62314, 62315, 63464, 63546, and 63652. The County also protested these applications along with filing timely protests to applications 62492, 63802, and 63883.

10. Section 533.370(3) provides in relevant part: "[W]here there is no unappropriated water in the proposed source of supply, or where its proposed use or change conflicts

with existing rights ... or threatens to prove detrimental to the public interest, the state engineer shall reject the application and refuse to issue the requested permit."

11. Section 210(b)(16) of the Settlement Act provides that the Secretary of the Interior must assess and remedy significant adverse impacts on domestic uses of groundwater resulting from the water purchases authorized by Title II. Accordingly, the USFWS prepared the Final Environmental Impact Statement, Water Rights Acquisition for Lahontan Valley Wetlands, Churchill County, Nevada (the "WEIS"). The County and the City filed suit in federal court challenging the WEIS' compliance with NEPA, but the district court rejected their challenge. *See Churchill County,* 276 F.3d at 1065. Although their appeal was pending before this court at the time that the County and the City filed their protest claims with the State Engineer, we subsequently affirmed the district court's ruling. *Id.* at 1079–82.

its failure to prepare a cumulative, programmatic EIS of all the transfers contemplated by the Settlement Act. Noting that the state water appropriations process was not the proper forum to address potential violations of federal law by a federal agency, the State Engineer approved all eight transfer applications.

As noted, on a petition for judicial review, the district court affirmed Ruling 4979. The court determined that substantial evidence supported the State Engineer's findings and that the State Engineer was not required to speculate whether future transfers might have a detrimental impact on the public interest or to wait for further studies evaluating the impacts of future transfers before ruling on USFWS' applications. Thus, although the eight applications are part of an extended program to transfer the place of use of approximately 75,000 acre-feet of water, the district court concluded that the State Engineer properly considered each application on its own merits and not on the basis of the entire water rights acquisition and transfer program contemplated by USFWS. The County and the City timely appealed.

## STANDARD OF REVIEW

■ Under the *Alpine*[12] and *Orr Ditch Decrees*,[13] the administration of water rights generally follows Nevada state law. *See United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 858 (9th Cir. 1983) (*Alpine I*); *United States v. Alpine Land & Reservoir Co.*, 878 F.2d 1217, 1222–23 (9th Cir.1989) (*Alpine II*). Nevada state law controls both the process and the substance of a proposed transfer of water rights. *See Alpine II*, 878 F.2d at 1223. Under Nevada law, decisions of the State Engineer are prima facie correct,

and the burden of proof is on the party challenging the decision. *See* N.R.S. § 533.450(9); *United States v. Alpine Land & Reservoir Co.*, 983 F.2d 1487, 1494 (9th Cir.1993) (*Alpine III*). We review the Nevada State Engineer's factual determinations to see if they are supported by substantial evidence. *See United States v. Alpine Land & Reservoir Co.*, 291 F.3d 1062, 1071–72 (9th Cir.2002) (*Alpine V*); *United States v. Orr Water Ditch Co.*, 256 F.3d 935, 948 (9th Cir.2001) (citing *Revert v. Ray*, 95 Nev. 782, 603 P.2d 262, 264 (1979)). We will uphold the State Engineer's legal conclusions as long as they are not contrary to law. *See Alpine V*, 291 F.3d at 1071–72. Although we consider the State Engineer's interpretations of Nevada statutes "persuasive," they are not controlling. *Orr Water Ditch Co.*, 256 F.3d at 945. We review *de novo* the district court's conclusions of law. *See id.*

## DISCUSSION

### I. Existing Water Rights

■ As a preliminary matter, we agree with the district court that the State Engineer's finding that the eight transfers would not conflict with existing water rights is supported by substantial evidence. Under N.R.S. section 533.370(3), the State Engineer must reject an application to transfer the place of use of a water right where its proposed use conflicts with existing rights, or would be detrimental to the public interest. With regard to applications 62314 and 63802, the record shows that the parcels of land involved are no longer capable of being used for irrigation purposes and, therefore, a change in the place of use would have no effect on continued recharge or groundwater levels.

---

**12.** *See United States v. Alpine Land & Reservoir Co.*, 503 F.Supp. 877 (D.Nev.1980), *modified by*, 697 F.2d 851 (9th Cir.1983).

**13.** *See United States v. Orr Water Ditch Co.*, Equity No. A–3 (D.Nev. Sept. 4, 1944).

As to the remaining six applications, the record provides substantial evidence for the State Engineer's finding that the existing places of use were not within a significant recharge area. Thus, a transfer of these rights would not unreasonably or adversely affect recharge of the aquifers from which the City draws its municipal water. The County and the City also failed to prove that any change in ground-water level would be unreasonable. Indeed, the only evidence they presented related to the potential impacts of the entire water rights acquisition and transfer program contemplated by USFWS. Substantial evidence supports the State Engineer's conclusion that the transfer of water rights requested in the eight applications would not have an adverse effect on existing water rights, and we reject the County's and the City's arguments to the contrary.

## II. Public Interest

Relying again on N.R.S. section 533.370(3), the County and the City argue that not only do these eight transfer applications pose a threat to the public interest, but, moreover, a cumulative study of the effects of all the water rights acquisitions and transfers contemplated under section 206 of the Settlement Act is necessary to evaluate whether the eight transfer applications will have a detrimental affect on the public interest. The County and the City contend that the cumulative effects of the acquisition program—the removal of thousands of acres of land from irrigation—will adversely impact the ground-water recharge, and that the State Engineer therefore violated his duty to protect the public interest as required by section 533.370(3).

Therefore, although the County and the City challenge the State Engineer's approval of USFWS' eight transfer applications, their principal concern is that the water rights acquisition and transfer program (which includes the eight transfer applications at issue) will prove to be detrimental to the public interest. To adopt the County and the City's argument, however, would require the State Engineer to adhere to an expansive definition of "public interest" under N.R.S. section 533.370(3)— an approach that has not been recognized by the Nevada legislature or the courts.

## A. Public Interest Under Nevada Law

The Nevada legislature has not provided an explicit definition of what constitutes a threat to the public interest under N.R.S. section 533.370(3).[14] By its silence, the

---

**14.** Section 533.370(3) does not elaborate on the meaning of "public interest." However, three other provisions in the Nevada Revised Statutes, N.R.S. sections 533.024, 540.011, and 445A.305, address state water policies in limited contexts:

Section 533.024 addresses effluent and domestic water wells and provides:
The legislature declares that it is the policy of this state: (1)[t]o encourage and promote the use of effluent, where that use is not contrary to the public health, safety or welfare ... [and] (2)[t]o recognize the importance of domestic wells as appurtenances to private homes, to create a protectible interest in such wells and to protect their supply of water from unreasonable adverse effects which are caused by municipal, quasi-municipal or industrial uses and which cannot reasonably be mitigated.

Section 540.011 addresses the planning and development of water resources and declares:
1. The legislature determines that it is the policy of the State of Nevada to continue to recognize the critical nature of the state's limited water resources. It is acknowledged that many of the state's surface water resources are committed to existing uses, under existing water rights, and that in many areas of the state the available ground water supplies have been appropriated for current uses. It is the policy of the State of Nevada to recognize and provide for the protection of these existing water rights. It is also the policy of the state to encourage efficient and nonwasteful use of these limited supplies.

legislature has left the task of defining "public interest" to the State Engineer and, ultimately, to the Nevada courts. In *Pyramid Lake Paiute Tribe of Indians v. Washoe County*, the Nevada Supreme Court reviewed the State Engineer's effort, directed by the state district court, to undertake this task in considering a number of transfer applications in Washoe County. 112 Nev. 743, 918 P.2d 697, 698–99 (1996). In defining "public interest," the State Engineer identified thirteen policy considerations contained in Nevada's water statutes that should guide any assessment of the public interest, including factors such as whether an appropriation of water rights is for a beneficial use and whether, in the State Engineer's judgment, a reduction of static water in a given area is reasonable.[15] *See id.* The Nevada Supreme Court subsequently concluded

> 2. The legislature further recognizes the relationship between the critical nature of the state's limited water resources and the increasing demands placed on these resources as the population of the state continues to grow.
> 3. The legislature further recognizes the relationship between the quantity of water and the quality of water, and the necessity to consider both factors simultaneously when planning the uses of water.
> 4. The legislature further recognizes the important role of water resource planning and that such planning must be based upon identifying current and future needs for water. The legislature determines that the purpose of the state's water resource planning is to assist the state, its local governments and its citizens in developing effective plans for the use of water.
>
> Section 445A.305 addresses the public health and safety concerns related to water pollution. It provides in relevant part:
>
> 1. The legislature finds that pollution of water in this state:
> (a) Adversely affects public health and welfare;
> (b) Is harmful to wildlife, fish and other aquatic life; and
> (c) Impairs domestic, agricultural, industrial, recreational and other beneficial uses of water.
> 2. The legislature declares that it is the policy of this state . . .:
> (a) To maintain the quality of the waters of the state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, the pursuit of agriculture, and the economic development of the state. . . .
>
> Thus, although the relevant Nevada statutes do not explicitly define the term "public interest," they do acknowledge the importance of protecting both the quality and quantity of local water.

15. Among the thirteen guidelines the State Engineer identified, the following policy considerations appear particularly relevant to the present case:

> 1. An appropriation must be for a beneficial use.
> 2. The applicant must demonstrate the amount, source and purpose of the appropriation.
> . . .
> 5. The applicant must demonstrate the magnitude of the use of water, such as the number of acres irrigated, the use to which generated hydroelectric power will be applied, or the number of animals to be watered.
> . . .
> 8. The State Engineer may also cooperate with federal authorities in monitoring the development and use of the water resources of the State.
> 9. [The State Engineer] may cooperate with California authorities in monitoring the future needs and uses of water in the Lake Tahoe area and to study ways of developing water supplies so that the development of the area will not be impeded.
> . . .
> 12. [The State Engineer] may determine what is a reasonable lowering of the static water level in an area after taking into account the economics of pumping water for the general type of crops growing and the effect of water use on the economy of the area in general.
> 13. Within an area that has been designated, the State Engineer may monitor and regulate the water supply.
>
> *Pyramid Lake*, 112 Nev. at 747, 918 P.2d 697 (alterations in original).

that these guidelines adequately defined the public interest, noting that the State Engineer's authority was limited to considerations identified in Nevada's water policy statutes. *Id.* at 700. Thus, the court in *Pyramid Lake* noted that the State Engineer could not include a consideration of factors identified in water allocation statutes from other states, or directives in Nevada statutes requiring other state administrative agencies to conduct a comparative economic analysis of water delivery alternatives, in a public interest analysis. *See id.* at 700–01.

■ Here, in light of the policy considerations that guide the State Engineer's determination of whether a change in place of use of existing water rights would prove detrimental to the public interest, the State Engineer's findings that the eight transfer applications would not adversely affect the City's existing water rights also supports his determination that the changes in places of use would not prove detrimental to the public interest. Further, the State Engineer properly rejected the County's and the City's claims that the tax base would be adversely affected and that the changes in places of use would create a potential dust hazard or air pollution problem because the County and the City failed to present any evidence to support these claims. Notably, the USFWS presented substantial evidence regarding the improved soil quality and renewed revegetation that has taken place in the existing places of use and that will continue to improve naturally, nearly eliminating the possibility of air contamination. The record establishes that the State Engineer fully considered all the protest claims, and that substantial evidence supports the Engineer's determination that approval of USFWS' eight transfer applications would not pose a threat to the public interest as defined by the Nevada Supreme Court in *Pyramid Lake.*

**B. Cumulative Studies and the Public Interest**

■ With respect to the County and the City's claim that a cumulative study is essential to avoid any potential detrimental impacts to the public interest, none of the policy considerations identified in *Pyramid Lake* encompasses the need for a comprehensive assessment of the potential effects of future water transfer applications. *See Pyramid Lake,* 918 P.2d at 698–99. Similarly, none of the legislative policy statements contained in N.R.S. sections 533.024, 540.011, and 445A.305 contemplates such an assessment before the State Engineer approves a transfer application.

There are two statutory provisions, however, that authorize the State Engineer, in his discretion, to conduct a study or to require a transfer applicant to submit an appropriate study before approving a transfer application. Section 532.165 provides that, among the State Engineer's many duties, the State Engineer "shall [c]onduct necessary studies and inventories," but it does not specify under what circumstances or when a study is necessary. The other relevant statute is N.R.S. section 533.368(1). Section 533.368(1) provides, in relevant part:

> [i]f the state engineer determines that a hydrological study, an environmental study or any other study is necessary before he makes a final determination on an application pursuant to N.R.S. 533.370 and the applicant, a governmental agency or other person has not conducted such a study or the required study is not available, the state engineer shall advise the applicant of the need for the study and the type of study required.

(emphasis added). Although section 533.368(5) authorizes the State Engineer to adopt regulations to implement the provisions of this statute, the State Engineer

has not done so. Further, as noted above, the State Engineer's discretion and authority under N.R.S. section 533.370(3) are limited to the policy considerations contained in Nevada's water law statutes, and the Nevada Supreme Court has stated that the authority to expand the definition of public interest beyond the plain text of the Nevada Revised Statutes rests with the Nevada legislature. *See Pyramid Lake,* 918 P.2d at 700–01. In sum, section 533.368(1) is the only statutory authority discussing the need for studies, and the text of section 533.368(1) is clear: the determination of whether to require a study—be it cumulative, hydrological, environmental, or any other form—is left to the sound discretion of the State Engineer.

Although the County and the City recognize the discretionary nature of the State Engineer's authority to require studies before approving transfer applications, they maintain that in exercising this discretion in approving USFWS' transfer applications, the State Engineer has not properly evaluated the evidence of potential harm to the public interest. Indeed, the County and the City point to statements of state and federal officials expressing concerns about the potential impacts that USFWS' acquisition and transfer program will have on underground water levels and the need for a study of the cumulative impacts. The County and the City also cite a prior ruling in which the State Engineer considered future changes in irrigation practices contemplated by the Settlement Act as evidence of his understanding of Nevada's "public interest." The County and the City maintain that the views of state and federal officials and the past actions of the State Engineer must also reflect Nevada's declared water policy and must be considered in any assessment of the public interest under section 533.370(3).

Again, to adopt the County and the City's argument would require expanding the definition of "public interest" beyond that recognized by the Nevada Supreme Court. As noted, the Nevada Supreme Court has looked to Nevada statutes that address state water policies to define public interest under section 533.370(3). Although the past actions and views of state, federal, or local officials may inform the State Engineer in his determination of whether to require a study, they do not *mandate* that he do so. Here, the State Engineer was required to rule on eight specific transfer applications by the USFWS. The record reflects that the Engineer recognized that these eight applications were part of a larger acquisition and transfer program, and after considering all the evidence presented at the hearings, the State Engineer, in his considered judgment, determined that he could rule on the applications without requiring a cumulative impacts study as argued by the County and the City. This determination was well within the State Engineer's discretion and did not violate his duty to protect the public interest under section 533.370(3).

### III. Abuse of Discretion

Next, the County and the City contend that, irrespective of whether the public interest requires the preparation of a comprehensive study of USFWS' acquisition and transfer program, the State Engineer abused his discretion under N.R.S. section 533.368(1) in approving the eight transfer applications without first directing USFWS to prepare such a study. The record shows, however, that in rejecting the County and the City's request for a cumulative impacts study, the State Engineer adequately performed his statutory duty.

At the administrative hearing, substantial evidence was presented by the parties regarding the merits of USFWS' eight transfer applications and the water rights acquisition program contemplated by USFWS under section 206 of the Settle-

ment Act. Indeed, the State Engineer took administrative notice of the WEIS along with two studies of the groundwater in the Lahontan Valley prepared by the United States Geological Survey.[16] Three other studies pertaining to the areas affected by the potential transfers were admitted into evidence, and ten different witnesses called by the parties testified about the water rights transfer applications and the merits of the various protest claims. All of this evidence pertained to the locations of the existing water rights, providing substantial support for the State Engineer's conclusion that additional studies were not necessary before approving USFWS' applications.

Moreover, section 533.368(1) imposes a duty on the State Engineer to assess the need for a study in connection with a specific transfer application.[17] The Nevada Supreme Court also recognized this statutory obligation when it approved in *Pyramid Lake* that the State Engineer's statement that the Engineer "must act on the applications before him and is not in a position to interfere with the decisions and responsibilities of [others]." *Pyramid Lake*, 918 P.2d at 699–701 (rejecting Washoe County's argument that certain transfers were detrimental to the public interest because the State Engineer had not analyzed alternative solutions to water importation). Although the court in *Pyramid Lake* addressed the separate and distinct

authority of Washoe County to conduct economic analyses of competing water projects, it did so in the context of evaluating the State Engineer's definition of Nevada's "public interest" and his approval of transfer applications under N.R.S. section 533.370(3), and therefore, its holding is instructive.

Just as the State Engineer in *Pyramid Lake* followed Nevada law in leaving consideration of alternative water projects to Washoe County officials, here, too, the State Engineer reasonably decided that determining the need for a cumulative environmental impacts study under NEPA (assessing the varied aspects of section 206 of the Settlement Act) was the duty of the Secretary of the Interior, and that any challenges to the WEIS should be brought in another forum. Although NEPA requires a federal agency to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment,"[18] there is no parallel provision in the Nevada Revised Statutes. Further, while there are federal regulations, such as 40 C.F.R. § 1500.1, that set forth the responsibilities of federal agencies "to promote compliance with the 'action-forcing' requirement of NEPA § 102(c)," *see Churchill County*, 276 F.3d at 1072 n. 7, there are no analogous regulations for Nevada state agencies. Under these circumstances, the State Engineer properly rejected the County and the

---

16. The hearing officer took administrative notice of: Patrick A. Glancy, U.S. Geological Survey Water Supply Paper 2263, *Geohydrology of the Basalt and Unconsolidated Sedimentary Aquifers in the Fallon Area, Churchill County, Nevada* (1986), and Nora B. Herrera et al., U.S. Geological Survey Water–Resources Investigations Report 99–4191, *Conceptual Evaluation of Ground–Water Flow and Simulated Effects of Changing Irrigation Practices on the Shallow Aquifer in the Fallon and Stillwater Areas, Churchill County, Nevada* (2000).

17. Consequently, although the State Engineer determined that the existing studies were sufficient to support approval of the USFWS' eight transfers, he did not determine whether the existing studies were adequate to assess the water rights acquisition and transfer program mandated by section 206. Thus, the County's argument that the State Engineer failed to adequately explain his determination that no further studies of the program were necessary assumes a conclusion that the State Engineer never made.

18. 42 U.S.C. § 4332(2)(C).

City's argument that he was required to order USFWS to conduct a cumulative environmental impact study to enforce its compliance with NEPA.

In light of the State Engineer's discretionary authority, the administrative record, and the Engineer's obligation to rule on pending applications, the State Engineer acted well within his discretion in approving USFWS' eight transfer applications without first obtaining the cumulative impacts study urged by the County and the City.

**IV. Refusal to Stay Consideration**

Finally, we hold that the State Engineer's decision not to stay consideration of the eight applications pending resolution of litigation challenging the validity of the WEIS was not contrary to law. Section 533.370(2)(b) of the Nevada Revised Statutes provides that "[i]n areas ... where court actions are pending, the state engineer *may* withhold action until ... the court action becomes final." (emphasis added). The State Engineer concluded that the decision whether to stay the transfer application proceedings was within his discretion and that because the district court had denied the County's challenge to the United States' compliance with the NEPA process, this denial was an adequate basis on which to proceed with the transfer applications in question. Because the Supreme Court denied certiorari on October 7, 2002, our decision in *Churchill County* is now final and, therefore, the issue is moot. *Churchill County v. Norton*, 537 U.S. 822, 123 S.Ct. 101, 154 L.Ed.2d 31 (2002).

**V.**

Because the State Engineer's findings in Ruling 4979 are supported by substantial evidence and his legal conclusions are not

* After examining the briefs and appellate rec-

contrary to law, the judgment of the district court is

**AFFIRMED.**